[No. C051657. Third Dist. May 23, 2007.]

RICHARD KING, Plaintiff and Appellant, v.
UNITED PARCEL SERVICE, INC., et al., Defendants and Respondents.

428

**COUNSEL**

Anthony M. Perez, Jr., Jeffrey D. Fulton; Bolling, Walter & Gawthrop, Marjorie E. Manning and T. D. Bolling, Jr., for Plaintiff and Appellant.

Paul, Hastings, Janofsky & Walker, Paul W. Cane, Jr., E. Jeffrey Grube and Sarah A. Jain for Defendants and Respondents.

**OPINION**

**RAYE, J.**—This case is not about whether a long-term supervisory employee of United Parcel Service, Inc. (UPS), asked or encouraged a driver to falsify a timecard to bring it into compliance with federal regulations limiting driving time, but whether UPS had an honest, good faith belief that the driver had violated its integrity policy when it fired him. There is no dispute the driver did falsify his timecard. The falsification occurred in mid-December 2002, about two months after plaintiff Richard King returned to work following a four-month medical leave of absence for a blood disorder. Finding no triable issues of material fact, the trial court granted UPS's motion for summary adjudication of plaintiff's causes of action for discrimination, failure to

provide reasonable accommodation, breach of an implied contract to terminate only for good cause, and defamation. We affirm.[1]

## FACTS

The determinative question in an appeal from a summary judgment is whether there are any material facts in dispute. Consequently, our preliminary recitation of "the facts" will present the undisputed facts from the moving party's perspective. Then, as we analyze the viability of each of the causes of action framed by the complaint, we will present the evidence that, from plaintiff's perspective, creates material triable facts. Our analysis of plaintiff's evidence is offered in the context of the elements of each of the causes of action.

According to UPS, the story begins and ends with integrity. UPS does not deny that plaintiff was a highly valued employee for nearly 30 years, that his drivers respected him, and that even Scott Vix, who made the decision to fire him, hated to lose him. He was not fired for failing to perform, for any personnel problems, or for expressing his displeasure for working long hours and assuming double responsibility. In UPS's view, he was fired for an integrity violation that occurred in the following context.

Federal law prohibits truck drivers from driving after they have been on duty for 60 hours in any seven consecutive days. In October 2002 UPS changed its own reporting policies to assure compliance with federal law by requiring its drivers to count break time as "on duty" hours. Before this change in policy, drivers were allowed to deduct break time from their hours. Violations can result in severe fines and penalties, up to and including the loss of UPS's operating rights. With such grave consequences for infractions, UPS requires its supervisors to monitor the drivers' hours daily and to identify any driver approaching the 60-hour limit. Plaintiff, a "feeder supervisor," acknowledged he was responsible for monitoring compliance with federal law.

For most of his career with UPS, plaintiff worked in its Redding facility. Scott Vix, the division manager, worked in Sacramento. On November 7, 2002, UPS fired Rob Nunes, plaintiff's feeder manager in Sacramento, for failing to review with plaintiff the new procedures for recording hours. One of the drivers in plaintiff's feeder department apparently had violated hours-of-service rules on six consecutive days.

On November 12 Vix drove to Redding to meet with plaintiff and review UPS's procedures for preventing violations of hours-of-service regulations.

---

[1] Our disposition renders moot the remaining causes of action.

Vix reiterated that it was plaintiff's responsibility to prevent violations by monitoring his drivers' hours and to emphasize that Nunes had been fired and his own job was in jeopardy if he failed to prevent future violations.

Yet on December 9 it appeared that another driver in the Redding facility violated the hours regulations by 3.9 hours. On December 13 Vix again drove to Redding to meet with plaintiff. He reviewed UPS integrity policies with plaintiff and emphasized the importance of complying with federal safety regulations. He reminded plaintiff again that future violations could lead to his discharge. He instructed plaintiff not to conceal any violation, but to notify him immediately if any violation occurred. Plaintiff signed a document acknowledging the importance of hours of service, of the UPS integrity policy, and of his responsibility to implement a procedure to eliminate future violations.

On December 16, a Monday, the Redding facility suffered a power outage. Plaintiff's assistant, Leslie Allen, did not work on Mondays. Rob Murphy, a business manager in Redding, asked plaintiff if Jeff Lester, one of plaintiff's drivers, was available to do some pickups that afternoon. Plaintiff authorized Lester to drive for Murphy.

When Allen arrived on the morning of December 17, she recorded the drivers' hours from the 16th. Around 9:30 a.m. Lester told Allen that Lester was needed in the packaging department. Allen told Lester he was out of hours and confirmed her calculations with personnel in Sacramento. Meanwhile, Lester borrowed Allen's calculator to refigure his hours. Plaintiff came into Allen's office and told her Lester's timecard was inaccurate and he would review it, and then he went into an office with Lester and the original timecard. When they emerged, plaintiff gave Allen a new timecard and instructed her to remove the previously submitted hours information from the UPS computer. The following day, Allen found the original timecard in a trash can in the office where plaintiff and Lester had conferred.

Meanwhile, an informal investigation apparently had begun. Plaintiff's supervisor in Sacramento, Ron Zakoor (who had replaced Nunes), left phone messages with both Rob Murphy and Leslie Allen inquiring about Lester's hours. Vix also investigated the facts and determined that Lester had worked until 6:00 p.m. on the 16th even though his second timecard indicated he was off duty at 2:30 p.m. UPS security investigated the hours-of-service violation and the two timecards, and took statements from Murphy, Zakoor, Lester, and Allen.

Lester admitted he had worked past 2:30 p.m. on December 16. He claimed he had falsified his timecard at plaintiff's direction. In his written

statement, he confirmed he "was asked by Rick King to change my Time Card . . . so I would not be over hours . . . ."

On December 19, 2002, the district security manager, a security manager, an employee relations manager, and Vix traveled to Redding to discuss the violation with plaintiff, who initially denied everything. According to Vix, when they confronted plaintiff with the original timecard retrieved from the garbage can, plaintiff admitted falsifying the timecard with the exclamation, "You got me." The employee relations manager and Vix informed plaintiff that UPS was terminating him for falsifying records, in breach of the UPS integrity policy. In his declaration, Vix wrote: "I felt bad about terminating King. I respected him for his years of service and the work he had done in the Redding facility. However, I had no choice because of King's serious integrity violation."

## DISCUSSION

## I

For plaintiff, the story is not about integrity; it is about pretext and bad faith. In his first cause of action for employment discrimination in violation of the California Fair Employment and Housing Act (FEHA; Gov. Code, § 12900 et seq.), he alleges the real reason he was fired was because he was disabled, not because he lacked integrity. At trial, he would have the burden of proving that he suffered from a disability within the meaning of the statute, he was otherwise qualified for his job, he suffered an adverse employment action, and that he was terminated because of his blood disorder. (*Finegan v. County of Los Angeles* (2001) 91 Cal.App.4th 1, 7 [109 Cal.Rptr.2d 762].) At issue in this appeal is the last element: whether he was terminated *because* he was disabled.

■ UPS, as the party moving for summary judgment, bears the initial burden of demonstrating that at least one of the elements of plaintiff's employment discrimination claim is without merit. (*Scalf v. D. B. Log Homes, Inc.* (2005) 128 Cal.App.4th 1510, 1518–1519 [27 Cal.Rptr.3d 826] (*Scalf*).)[2]

[2] Courts generally employ the burden-shifting formula first articulated by the United States Supreme Court in *McDonnell Douglas Corp. v. Green* (1973) 411 U.S. 792 [36 L.Ed.2d 668, 93 S.Ct. 1817] (*McDonnell Douglas*) as the basic framework for reviewing motions for summary judgment in discrimination cases. (*Sada v. Robert F. Kennedy Medical Center* (1997) 56 Cal.App.4th 138, 148 [65 Cal.Rptr.2d 112]; *Caldwell v. Paramount Unified School Dist.* (1995) 41 Cal.App.4th 189, 201–205 [48 Cal.Rptr.2d 448].) Under the *McDonnell Douglas* burden-shifting formula, the plaintiff has the initial burden of establishing a prima facie case of discrimination. UPS does not argue that plaintiff failed to meet his initial burden. Thus, the burden shifted to UPS to produce admissible evidence that the adverse employment action was

We disagree with plaintiff that UPS failed to offer any evidence to sustain its burden of proof. The trial court found UPS had fired plaintiff for a legitimate reason—he breached the company's integrity policy. The evidence described at length above satisfies the employer's burden to make a " 'sufficient showing of a legitimate reason for discharge.' " (*Hanson v. Lucky Stores, Inc.* (1999) 74 Cal.App.4th 215, 225 [87 Cal.Rptr.2d 487]. (*Hanson*).) According to UPS's evidence, the decision makers entertained an honest belief that plaintiff had either personally falsified a driver's timecard or directed the driver to do so. For purposes of establishing the moving employer's initial burden of proof, it does not matter whether plaintiff actually did commit an integrity violation as long as UPS honestly believed he did. (*Villiarimo v. Aloha Island Air, Inc.* (9th Cir. 2002) 281 F.3d 1054, 1063 (*Villiarimo*).)[3]

■ Once an employer satisfies its initial burden of proving the legitimacy of its reason for termination, the discharged employee seeking to avert summary judgment must present specific and substantial responsive evidence that the employer's evidence was in fact insufficient or that there is a triable issue of fact material to the employer's motive. (*Hanson, supra*, 74 Cal.App.4th at p. 225; *Villiarimo, supra*, 281 F.3d at p. 1062.) In other words, plaintiff must produce substantial responsive evidence to show that UPS's ostensible motive was pretextual; that is, "that a discriminatory reason more likely motivated the employer or that the employer's explanation is unworthy of credence." (*Chiaramonte v. Fashion Bed Group, Inc.* (7th Cir. 1997) 129 F.3d 391, 398 (*Chiaramonte*).)

While we must liberally construe plaintiff's showing and resolve any doubts about the propriety of a summary judgment in plaintiff's favor, plaintiff's evidence remains subject to careful scrutiny. (*Scalf, supra*, 128 Cal.App.4th at pp. 1518–1519.) We can find a triable issue of material fact "if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850 [107 Cal.Rptr.2d 841, 24 P.3d 493].) Moreover, plaintiff's subjective beliefs in an employment discrimination case do not create a genuine issue of fact; nor do uncorroborated and self-serving declarations. (*Chiaramonte, supra*, 129 F.3d at p. 401; *Villiarimo, supra*, 281 F.3d at p. 1061.) And finally, plaintiff's evidence must relate to the motivation of the decision makers to prove, by nonspeculative evidence, an actual causal link

taken for a legitimate, nondiscriminatory reason. (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 355–356 [100 Cal.Rptr.2d 352, 8 P.3d 1089].) This burden coincides with UPS's burden as the moving party to negate an element of plaintiff's cause of action.

[3] Because FEHA is modeled on the federal Americans with Disabilities Act of 1990 (42 U.S.C. § 12101 et seq.), analogous federal cases are useful in deciding cases under FEHA. (*Prilliman v. United Air Lines, Inc.* (1997) 53 Cal.App.4th 935, 948 [62 Cal.Rptr.2d 142] (*Prilliman*).)

between prohibited motivation and termination. (*Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763, 774 [107 Cal.Rptr.2d 617, 23 P.3d 1143].)

Plaintiff presented voluminous evidence that he competently performed his job for nearly 30 years before he was diagnosed with a blood disorder necessitating a medical leave of absence from May 2002 through September 2002. He digs deeper into the facts preceding his termination in an attempt to demonstrate that his firing for an integrity violation was pretextual. Thus, we consider whether plaintiff has presented specific and substantial evidence that he was fired because he was disabled. His evidence focuses on the behavior of supervisors who did not participate in the decision to fire him, the inconsistencies in the accounts provided by Lester and Allen, the timing of his discharge, and the drop in his compensation package in the same year.

Plaintiff accuses UPS of "cloak-and-dagger" techniques in an undercover conspiracy to get rid of him. But he fails to clearly identify the culprits. He complains about Robert Murphy, Bob Rogers, and Ron Zakoor, but none of these men were involved in the decision to terminate him, and his dispute with them about his hours and responsibilities preceded his disability leave.

In March 2002 plaintiff claims he was required to perform double duty, both as a feeder supervisor and a supervisor of the "local sort." He ordinarily worked from approximately 8:00 a.m. to 6:00 p.m., but this change in duties required him to work from 1:00 p.m. to 10:00 p.m. Fed up, he eventually left a note for Murphy saying he was quitting the local sort. Murphy and another UPS manager, Bob Rogers, interpreted his notification as resignation from the company altogether. By invoking the employee grievance procedures, plaintiff succeeded in having his job reinstated. It is not unreasonable to infer from this record that these supervisors harbored a lingering resentment toward plaintiff as a result of this episode. But the animosity of coworkers, even if superior to plaintiff in rank or tenure, is not material to the sole issue contested by UPS. There is no evidence that Rogers, Murphy, or Zakoor participated in the decision to fire him. In the absence of evidence that they were involved in the decisionmaking process, their feelings regarding plaintiff's performance have no bearing in the summary judgment proceedings, and their bitterness or mistreatment, if any, is not material to whether plaintiff was terminated because he was disabled.

Plaintiff's aspersions on Leslie Allen and Jeff Lester, however, bear closer examination. Scott Vix, the division manager and one of the primary decision makers in firing plaintiff, declared that he relied on written statements provided by Allen and Lester, in addition to two timecards for Lester, both dated December 16, 2002, written statements by Rob Murphy and Ron Zakoor about a prior incident regarding another driver, as well as Murphy's

written statement about the Lester incident. Allen wrote that plaintiff told her Lester's timecard was wrong; she saw him go into an office with Lester and emerge thereafter with a new timecard, and he instructed her to input the information from the second timecard into the computer. The next day she found the original timecard in a trash can in that same office. Even more damaging, Lester wrote that plaintiff instructed him to change his timecard.

But plaintiff points to additional evidence he claims shows that UPS pressured these employees to make false charges. Of particular significance to plaintiff is Lester's deposition testimony wherein he stated that he did not have a specific memory of how his timecard "got changed," he described the intimidating conditions under which he made his statement, and most pointedly, he claimed he was not interviewed by UPS security until after plaintiff was fired. Citing inconsistencies between Lester's written statement and his testimony, plaintiff infers UPS solicited a false statement and argues that if company investigators would solicit one false statement, it is reasonable to infer they would solicit two. Thus, he discounts the statements of both Allen and Lester as legitimate justification for his termination.

Plaintiff's allegation of intimidation and fraud is indeed a serious one. Even if we were to assume that someone either backdated Lester's statement or pressured him into writing a false statement, plaintiff offers no evidence to connect the wrongdoing with any of the decision makers. Lester himself has never denied that he falsified his timecard or that he told plaintiff he might have gone over hours. As a result, it would be rank speculation to infer a causal connection between any possible wrongdoing in the solicitation of Lester's statement and the decision to terminate plaintiff.

Moreover, Lester's deposition testimony does not exonerate plaintiff. There is no doubt Lester backtracked from his written statement and attempted to rehabilitate his former boss. But he admitted that when he told plaintiff he might have gone over the maximum hours and asked what would happen if he had, plaintiff responded, "I'm fired." He testified that while his interview felt intimidating, UPS did not ask him to fabricate a statement or to sign a statement that was not accurate. He does not offer any explanation for the confusion in the dates. We conclude that his ambiguous testimony taken in light of his admission that he falsified a time card does not raise a reasonable inference that the division manager, employee relations manager, and security personnel committed fraud to cover up a discriminatory animus they harbored toward plaintiff.

Plaintiff goes to some length to demonstrate that Lester in fact had 8.8 remaining hours when Allen submitted his hours. He argues that because Lester was not over hours, plaintiff would have had no motive to falsify the

timecard. But everyone, including Lester, believed at the time that he was over hours. We need not waste time reviewing the accuracy of Allen's, Lester's, or anyone else's calculations because the truth or falsity of the calculations is not at issue. It is the employer's honest belief in the stated reasons for firing an employee and not the objective truth or falsity of the underlying facts that is at issue in a discrimination case. (*Villiarimo, supra,* 281 F.3d at p. 1063.) Having considered the declarations submitted in support of, and in opposition to, the summary judgment, including the attached exhibits, we conclude plaintiff has failed to submit substantial evidence that UPS did not honestly believe plaintiff had violated its integrity policy when it fired him.

Plaintiff asks us to infer a discriminatory animus from the timing of his discharge. He reminds us that he was fired less than two months after returning from a four-month leave of absence. But a disabled employee has no greater prerogative to compromise his integrity than any other employee. The mere fact that UPS found plaintiff had breached its integrity policy shortly after returning to work is insufficient to raise an inference that his blood disorder prompted his discharge.

Nor does plaintiff's failure to receive a bonus in 2002 buttress his charge that he was punished, and ultimately discharged, for being sick. There is little doubt that plaintiff's working relationship with his supervisors deteriorated after the March 2002 conflict over his hours and responsibilities. After plaintiff resolved his employee grievance in March 2002, Roger told him he would not receive a raise and he would not recommend him for a stock option bonus. According to UPS, plaintiff did not like the local sort hours. We are not in a position to assess the reasonableness of the UPS compensation package for the year 2002 or whether plaintiff was treated fairly by Murphy, Roger, or Zakoor. We are in a position, however, to say that plaintiff's evidence falls woefully short of raising a reasonable inference that his problems with his supervisors in March somehow demonstrated that Vix and the others decided to discharge him nine months later because he had become disabled.

 The inference is particularly weak when considered in the context of UPS's prior conduct toward plaintiff. In March of 2002 it had sustained plaintiff's grievance and reinstated him over Zakoor's and Murphy's objections. After plaintiff returned from his medical leave of absence, management intensified its oversight of drivers' hours to assure compliance with federal regulations. Vix fired Nunes, not plaintiff, when one of plaintiff's drivers exceeded the allowable hours because, according to Vix, Nunes had not communicated new company policies to plaintiff. Vix drove to Redding twice to warn plaintiff that his job was in jeopardy and that it was his responsibility

to monitor and report drivers' hours. It is undisputed that plaintiff was well aware of company policy, his responsibility, and the consequences that would ensue if he failed to meet his responsibility. Indeed, he told Lester that if he had gone over hours, he would be fired. In sum, there is no reasonable inference to be drawn that UPS, which had forgone several opportunities to discharge plaintiff, suddenly changed course and fired him because of his blood disorder and not because of its belief that he had violated the integrity policy.

Plaintiff accuses the trial court of transgressing what some have called the "golden rule" of summary judgments by considering evidence that was not expressly delineated in the separate statement of undisputed facts. (*San Diego Watercrafts, Inc. v. Wells Fargo Bank* (2002) 102 Cal.App.4th 308, 310–311 [125 Cal.Rptr.2d 499] (*San Diego Watercrafts*).) He does not allege that the trial court looked outside the record, only that it relied on declarations, exhibits, and extracts from depositions that were not specifically identified in the separate statement. He contends the purpose of the golden rule is to preserve his right to due process by assuring he had notice of the facts UPS would rely upon to deny him a trial. The trial court, he insists, abused its discretion by violating the golden rule.

In *Fenn v. Sherriff* (2003) 109 Cal.App.4th 1466 [1 Cal.Rptr.3d 185], however, we accepted the basic notion that the trial court had discretion to consider all the evidence presented by the moving party even if that evidence did not appear in the separate statement. (*Id.* at pp. 1480–1481.) Here, while the evidence may have been voluminous, the issue was simple and straightforward: was the firing pretextual? Plaintiff certainly had notice that UPS based its motion for summary judgment on the solitary claim that it had a legitimate and nondiscriminatory reason for discharging him. He concedes as much in the opening brief. Yet he lodges an assault on UPS's evidence, insisting the trial court relied not on any evidence, but on UPS's bare conclusions. For example, plaintiff states that UPS presented absolutely no evidence of its honest belief that he committed an integrity violation because, in the separate statement, it referred to a single line in Vix's declaration wherein he stated he fired plaintiff for breaching the integrity policy. He argues the golden rule compels the court to ignore the rest of the declaration because it was not referenced in the separate statement. Such a rigid rule of exclusion is contrary to the express terms of the summary judgment statute. (Code Civ. Proc., § 437c, subd. (b).)

In rejecting the authority cited by plaintiff (*United Community Church v. Garcin* (1991) 231 Cal.App.3d 327, 337 [282 Cal.Rptr. 368]), the court in *San Diego Watercrafts, supra,* 102 Cal.App.4th 308 held that "the absolute prohibition on consideration of nonreferenced evidence is unsupported by the statute." (*Id.* at p. 311.) The court rejected the substance of the

golden rule because it ignores the summary judgment statute's reliance on the court's discretion. (Code Civ. Proc., § 437c, subd. (b).) "Therefore, we may not mechanically conclude, as the 'Golden Rule' would have us do, that the court should never consider evidence not referenced in the separate statement. The statute is permissive, not mandatory . . . ." (*San Diego Watercrafts*, *supra*, 102 Cal.App.4th at p. 315.) Thus the court concluded: "Whether to consider evidence not referenced in the moving party's separate statement rests with the sound discretion of the trial court, and we review the decision to consider or not consider this evidence for an abuse of that discretion." (*Id.* at p. 316.)

Plaintiff would have us ignore the meat of declarations simply because UPS referenced only parts of those declarations in the separate statement and thereby preclude the trial court from understanding the context in which the excerpt is made. The separate statement is not designed to pervert the truth, but merely to expedite and clarify the germane facts. We conclude the trial court did not abuse its discretion by considering evidence of which plaintiff was well aware and which he had ample opportunity to debunk. This is not a case, such as *San Diego Watercrafts*, where the plaintiff was sabotaged by the sneaky introduction of new evidence for the first time in the defendant's reply. (*San Diego Watercrafts*, *supra*, 102 Cal.App.4th at p. 316.) Rather, UPS submitted declarations by those who made the decision to discharge plaintiff as evidence of the purity of their intentions. We cannot say the trial court abused its discretion by considering the evidence material to the single, dispositive issue.

## II

Our resolution of plaintiff's discrimination claim is dispositive of his cause of action for breach of contract as well. Plaintiff contends UPS impliedly promised to terminate him only for good cause, thereby rebutting the presumption of at-will employment. We need not consider who had the burden of proving whether plaintiff remained an at-will employee, as plaintiff asks, because even if we assume UPS agreed to discharge him only for good cause, he has failed to raise any triable issue that his discharge was in bad faith.

Good cause, in the context of implied employment contracts, means "fair and honest reasons, regulated by good faith on the part of the employer, that are not trivial, arbitrary or capricious, unrelated to business needs or goals, or pretextual." (*Cotran v. Rollins Hudig Hall Internat., Inc.* (1998) 17 Cal.4th 93, 108 [69 Cal.Rptr.2d 900, 948 P.2d 412] (*Cotran*).) The question critical to UPS's liability is not whether plaintiff in fact violated the integrity policy by encouraging a subordinate to falsify his timecard, but whether UPS, acting in good faith following an appropriate investigation, had reasonable grounds for believing plaintiff had done so. (*Id.* at p. 109.)

We explained at some length above that plaintiff failed to offer specific, substantial, responsive evidence that his discharge was pretextual. Nor can it be reasonably asserted that termination for a violation of the integrity policy is trivial, arbitrary, or capricious. Noncompliance with federal regulations risks UPS's license to conduct business. Thus, honest recordation of drivers' hours is critical to the very operation of the business. Integrity is hardly a trivial matter.

Plaintiff points to flaws in the investigation as evidence of bad faith. Apparently under the mistaken belief that he was entitled to a more formal hearing with advance notice of the charges against him, he complains he was not given an adequate opportunity to rebut UPS's allegation of wrongdoing. We disagree.

In *Cotran, supra,* 17 Cal.4th 93, the Supreme Court relied upon the poignant wisdom of Lord Halsbury in *Board of Education v. Rice* (1911) App.Cas. 179 and Justice Tobriner in *Pinsker v. Pacific Coast Society of Orthodontists* (1974) 12 Cal.3d 541 [116 Cal.Rptr. 245, 526 P.2d 253]. Lord Halsbury wrote: " 'I need not add that . . . [the board] must act in good faith and fairly listen to both sides, for that is a duty lying upon every one who decides anything. But I do not think they are bound to treat such a question as though it were a trial . . . . They can obtain information in any way they think best, always giving a fair opportunity to those who are parties in the controversy for correcting or contradicting any relevant statement prejudicial to their view.' " (*Cotran, supra,* 17 Cal.4th at p. 108, quoting *Board of Education v. Rice, supra,* at p. 182.)

Similarly, Justice Tobriner reminds us that " '[t]he common law requirement of a fair procedure does not compel formal proceedings with all the embellishments of a court trial [citation], nor adherence to a single mode of process. It may be satisfied by any one of a variety of procedures which afford a fair opportunity for an applicant to present his position. . . . [T]his court should not attempt to fix a rigid procedure that must invariably be observed.' " (*Cotran, supra,* 17 Cal.4th at p. 108, quoting *Pinsker v. Pacific Coast Society of Orthodontists, supra,* 12 Cal.3d at p. 555.)

 Flexibility is the signature lesson from *Cotran.* The Supreme Court is unwilling to compel employers to undertake a precise type of investigation as long as the process is inherently fair. Here plaintiff's supervisors began an informal investigation when alerted to the suspicious manner in which Lester's timecard was changed and Allen was directed to change the accounting. The security department thereafter took over the investigation and interviewed the key witnesses to the events. Top-level management, accompanied by a manager from the employee relations department and security managers, then presented the evidence to plaintiff and gave him the opportu-

nity to respond to the allegations. When confronted with the original time-card, plaintiff stated simply, "You got me," a remark Scott Vix interpreted as an admission. Because neutral personnel investigated the facts, eyewitnesses provided statements, and plaintiff was given an opportunity to explain what happened, we conclude UPS conducted an adequate investigation as a matter of law.

As a consequence, we agree with the trial court that plaintiff failed to present sufficient evidence that the decision to fire him was substantively or procedurally flawed. That is to say, plaintiff failed to unveil a triable issue of fact that he was fired in bad faith. We can draw no reasonable inference that personal animosity, unlawful discrimination, or any other malicious motive prompted plaintiff's discharge. Summary adjudication of the central claim was properly granted.

## III

■ Plaintiff acknowledges that because an employer and its employees have a common interest in protecting the workplace from abuse, an employer's statements to employees regarding the reasons for termination of another employee generally are privileged. (*Cuenca v. Safeway San Francisco Employees Fed. Credit Union* (1986) 180 Cal.App.3d 985, 995–996 [225 Cal.Rptr. 852]; *Deaile v. General Telephone Co. of California* (1974) 40 Cal.App.3d 841, 849–850 [115 Cal.Rptr. 582] (*Deaile*).) He maintains, however, that UPS lost its "common interest" privilege by terminating him with malice. (*Noel v. River Hills Wilsons, Inc.* (2003) 113 Cal.App.4th 1363, 1371 [7 Cal.Rptr.3d 216] (*Noel*).) His argument is but a reformulation of the same evidence we concluded did not raise genuine triable issues that the discharge was either pretextual or in bad faith. If the discharge was neither pretextual nor in bad faith, it certainly was not malicious.

■ The trial court granted summary adjudication of plaintiff's defamation claim because the alleged statements were privileged. Section 47 of the Civil Code states, in pertinent part: "A privileged publication . . . is one made: [¶] . . . [¶] (c) [i]n a communication, without malice, to a person interested therein . . . ." Parties in a business or contractual relationship have the requisite "common interest" for the privilege to apply. (*Kashian v. Harriman* (2002) 98 Cal.App.4th 892, 913, 930–931 [120 Cal.Rptr.2d 576].)

In an analogous case, an employer discharged a truck driver for allegedly falsifying his timecard and driver's log. (*Fisher v. Lucky Stores, Inc.* (N.D.Cal., Apr. 4, 1994, No. C93-1019 FMS) 1994 WL 125104.) The federal district court explained its rejection of the employee's defamation claim this way: ". . . Fisher alleges that employees were the recipients of the alleged defamatory remarks. Lucky had an interest in communicating the reason for Fisher's termination to the employees; it wanted employees to be aware of

the penalties for falsifying time records. Fisher points to no evidence of actual malice or excessive publication. Any statements made regarding the reasons for Fisher's termination furthered the interest of both Lucky and the employees; the alleged defamatory statements made to employees are, accordingly, privileged." (*Ibid.*; accord, *Deaile, supra,* 40 Cal.App.3d at pp. 846–847.)

Apparently conceding that he has insufficient evidence that Vix or any of the other UPS decision makers were motivated by the type of hatred or ill will to constitute "actual malice," plaintiff contends the evidence shows UPS " ' "lacked reasonable grounds for belief in the truth of the publication and therefore acted in reckless disregard of the plaintiff's rights . . . ." ' " (*Noel, supra,* 113 Cal.App.4th at p. 1370.) Recycling the same evidence of pretext and bad faith, plaintiff insists the record is replete with evidence of the type of reckless behavior also considered malice. Actually, the evidence belies his contention that a reasonable juror could find malice by clear and convincing evidence.

Plaintiff himself testified he had no reason to believe Vix disliked him or wished him harm. Nor does he dispute that Vix warned him at least twice of the importance of monitoring his drivers' hours and the risk of discharge if drivers violated the federal restrictions. But he contends there was no reasonable basis for his discharge or for telling his coworkers he violated the integrity policy when in fact he did not.

In his declaration submitted in support of the motion for summary judgment, Vix explained the circumstances in which plaintiff was discharged and his concern about the drivers' reactions. As Vix recounted, he was very concerned about driver safety because plaintiff was fired on a day when the weather was treacherous. Vix recognized plaintiff was well liked by his drivers and believed they deserved to be told plaintiff had been discharged and why. He stayed in Redding until midnight to explain the circumstances to the drivers, either individually or in small groups, to reassure them and boost morale, and to keep the business running efficiently. Thus, his statements were appropriately published to other employees at UPS, all of whom had a common interest in discharging their responsibilities at the Redding facility.

Plaintiff suggests that overpublication defeated the privilege. Not so. Vix told the drivers in Redding who were directly affected by plaintiff's termination. One driver stated he accompanied Vix on the long drive back to Sacramento, and he never spoke of plaintiff's discharge. Another was equally surprised he heard nothing said by any UPS managers.

Similarly, Murphy and Zakoor also told other employees about the discharge. Murphy responded to a direct question by a driver, and Zakoor

explained to his junior supervisors why plaintiff had been fired in order to reinforce the importance of the integrity policy. Plaintiff simply has failed to produce any evidence that UPS overpublished statements about him to those with no interest in the business or for any nefarious motives.

Once again, plaintiff failed to demonstrate the need for a trial. As the trial court aptly found, the challenged statements were privileged as a matter of law. (*Institute of Athletic Motivation v. University of Illinois* (1980) 114 Cal.App.3d 1, 14 [170 Cal.Rptr. 411].) We reiterate the limited scope of judicial review of an employer's decision to terminate an employee accused of transgressing the integrity policy of the company. We do not know, and cannot determine, whether plaintiff was guilty of the malfeasance as alleged. But his factual innocence or guilt is beyond the purview of this appeal. He has not unveiled the quantum of evidence necessary to create a triable issue that UPS decision makers acted with the requisite malice to sustain a defamation claim. In the absence of malice, UPS's statements to other employees were privileged and plaintiff cannot recover for defamation.

## IV

■ Under FEHA, an employer's failure to provide reasonable accommodation to enable an employee with a disability to perform the essential functions of his job constitutes an unlawful employment practice. (Gov. Code, § 12940, subd. (m); *Spitzer v. Good Guys, Inc.* (2000) 80 Cal.App.4th 1376, 1383 [96 Cal.Rptr.2d 236] (*Spitzer*).) An employer's failure to provide reasonable accommodation is a violation of the statute even in the absence of an adverse employment action. (*Jensen v. Wells Fargo Bank* (2000) 85 Cal.App.4th 245, 256 [102 Cal.Rptr.2d 55] (*Jensen*).) As a result, our conclusion that plaintiff has not presented a genuine issue of material fact regarding UPS's motive for terminating him does not resolve whether there are triable issues on the failure to accommodate claim. The issue is a much closer one to resolve.

■ If, as we assume here, an employee is disabled, "the employer cannot prevail on summary judgment on a claim of failure to reasonably accommodate unless it establishes through undisputed facts that (1) reasonable accommodation was offered and refused; (2) there simply was no vacant position within the employer's organization for which the disabled employee was qualified and which the disabled employee was capable of performing

with or without accommodation; or (3) the employer did everything in its power to find a reasonable accommodation, but the informal interactive process broke down because the employee failed to engage in discussions in good faith." (*Jensen, supra,* 85 Cal.App.4th at p. 263.)

It is undisputed that plaintiff's doctor released him to perform "his regular duties and regular hours." UPS contends that in the absence of a specific request or clarification, his regular duties and regular hours are those he worked before his medical leave of absence. His regular duties and regular hours, in UPS's view, included working the local sort even when that meant working the 1:00 p.m. to 10:00 p.m. shift. Additionally, UPS contends it was entitled to judgment because plaintiff did not request a more specific accommodation.

 "[T]he interactive process of fashioning an appropriate accommodation lies primarily with the employee." (*Spitzer, supra,* 80 Cal.App.4th at p. 1384.) An employee cannot demand clairvoyance of his employer. (*Conneen v. MBNA America Bank, N.A.* (3d Cir. 2003) 334 F.3d 318, 331 (*Conneen*).) " '[T]he employee can't expect the employer to read his mind and know he secretly wanted a particular accommodation and sue the employer for not providing it. Nor is an employer ordinarily liable for failing to accommodate a disability of which it had no knowledge.' " (*Prilliman, supra,* 53 Cal.App.4th at p. 954.) "It is an employee's responsibility to understand his or her own physical or mental condition well enough to present the employer at the earliest opportunity with a concise list of restrictions which must be met to accommodate the employee." (*Jensen, supra,* 85 Cal.App.4th at p. 266.) Plaintiff therefore was obliged "to tender a specific request for a necessary accommodation." (*Spitzer, supra,* 80 Cal.App.4th at p. 1384.)

The trial court found that plaintiff did not make a specific request for necessary accommodation or a concise list of restrictions. The court ruled, "The physician's note did not contain any specific restrictions, and plaintiff never requested nor provided to UPS a doctor's note limiting the number of hours he could work in a day. [Citation.] Nor did plaintiff ever inform his supervisor, Vix, or human resources that he was not able to work the hours he had previously worked. [Citation.] As plaintiff was working the local sort shift before he left on medical leave, in the absence of specific restrictions, UPS reasonably understood those to be King's regular duties and regular hours. Plaintiff admitted in his deposition that he was able to 'get the job done.' " The court concluded there was no disputed issue of material fact.

Plaintiff disagrees. He disputes the trial court's interpretation of the meaning of his physician's release, contending that regular hours referred not to the hours required to work the local sort, but the hours he worked as a feeder supervisor. Moreover, he claims his supervisor, Nunes, had no difficulty understanding his limitations and did not ask him to resume his responsibilities to help out with the local sort. It was not until Nunes was fired and his nemesis, Zakoor, became his supervisor that he was compelled to work the local sort. When he complained to Vix, he was told to speak to Zakoor about his need for further accommodation. Plaintiff's deposition testimony regarding his communications with Zakoor is vague at best. Zakoor, on the other hand, testified he had no discussion with plaintiff about his physical disability.

The question thus presented is whether plaintiff's evidence creates a triable issue. Although the question is a close one, we conclude it does not. The discrepancy over just what plaintiff said to whom does not, given what is not disputed, rise to the level of material fact. (*Conneen, supra,* 334 F.3d at p. 331.) While he describes in painful detail how poorly he felt, he simply does not establish that he communicated his distress to his supervisors or made the kind of specific request for a modified work schedule required to trigger an employer's duty to provide accommodation. We recognize that the interactive process compelled by FEHA requires flexibility by both the employer and employee, and that no magic words are required to necessitate accommodation. But plaintiff has presented far less than what FEHA demands. We agree with the trial court that plaintiff has not sustained his burden of demonstrating a genuine issue of material fact given his failure to get additional clarification from his doctor to specifically restrict his hours and to communicate his limitations to his supervisors. Given that plaintiff had complained about working the local sort hours before the onset of his disability and his apparent ability to work them and "get the job done" after his return, it was incumbent upon him to produce clear and unambiguous doctor's orders restricting the hours he could work.

This case has regrettable consequences for plaintiff, who worked for UPS almost 30 years and claims to have lost all of his medical benefits when he was very close to retiring. We are not empowered to determine whether plaintiff deserved to be discharged for the integrity violation UPS management honestly believed he committed. Even if, as plaintiff insists, he was innocent of the charges leveled against him, the law does not condemn managerial mistakes so long as his employer honestly believed the reasons for his termination. Because he has failed to present substantial evidence that the decision was anything more than a mistake by demonstrating triable issues of pretext, bad faith, or malice, we must affirm the summary judgment in favor of UPS. His claim for punitive damages is moot.

## DISPOSITION

The judgment is affirmed.

Nicholson, Acting P. J., and Hull, J., concurred.

Appellant's petition for review by the Supreme Court was denied September 25, 2007, S155092.