Filed 8/26/16  Baltrenas v. Kaiser Foundation Hospitals CA2/1

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| LAIMA BALTRENAS, | B266356 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BC524564) |
| v. | |
| KAISER FOUNDATION HOSPITALS et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Gregory Keosian, Judge.  Affirmed.

Balesh Law Group and James R. Balesh for Plaintiff and Appellant.

Miller Law Group, Michele Ballard Miller and Joseph P. Mascovich for Defendants and Respondents.

_____

Appellant Laima Baltrenas appeals from the trial court's grant of summary judgment for respondents Kaiser Foundation Hospitals (Kaiser) and Dennis Long, her former supervisor. Baltrenas, a Catholic, argues triable issues of fact remain as to whether her termination for cause was pretext for Long's religious animus against her. We disagree and affirm.

## BACKGROUND

Kaiser hired Baltrenas in 1985 as an analyst in its Information Services Department. Baltrenas primarily worked in the Core Finance Systems group (CFS), which maintains and operates financial software applications used by the business arms of Kaiser. Each business arm using one of CFS's financial applications "owns" the application's software and is called a "Business Application Owner" (BAO).[1] Only the BAO may approve changes to or tests on its software's coding. In addition, any changes to or tests on that software must also comply with Kaiser's internal policies, including its "Sarbanes-Oxley controls" (SOX controls).[2] The SOX controls require personnel to acquire and document specific types of authorization for testing, coding, or data manipulation. "The primary goal" of these controls "is to manage the initiation, review, testing, approval, and implementation and documentation of all proposed changes," in part, to "[e]nsure changes do not adversely impact key financial data and controls."

Two SOX controls are at issue here, controls 12.14.03 and 12.15.01. SOX control 12.14.03 requires that "[b]usiness, technical and security change requests are required to

---

[1] The BAO also designates a "Business Application Owner Delegate" (BAOD or BAO/D) which may operate on the BAO's behalf. Our analysis does not require us to distinguish between the two, and for ease of reference we refer to only the BAO.

[2] Congress enacted the Sarbanes-Oxley Act of 2002, 15 United States Code section 7201 et seq. (SOX), in the wake of several corporate and accounting scandals. SOX requires, in part, that corporate officers ensure their companies have designed and maintained internal controls over financial reporting. In the digital age, information technology departments (commonly referred to as IT departments) play a role in responsibly implementing and maintaining internal financial controls under SOX.

be documented and approved by appropriate authorized individuals within a tracking tool . . . prior to initiation of all changes as documented in the Change Management Policy and Procedures." The control further specifies 13 step-by-step instructions which must be followed, ranging from the mandatory subject-line of the e-mail requesting changes to the format the approval must be captured in and saved. SOX control 12.15.01 requires that "[a]ll changes" must "undergo testing . . . and review to validate application functionality and data integrity as documented in the Change Management Policy and Procedures. . . . Sign-off for testing is documented, including those for testing standards, plans and results, by the appropriate owner (both Business and IT) within a tracking tool." Under this control, "[m]anagement ensures that testing occurs in a non-production environment to ensure the integrity of production data as documented in the Change Management Policy and Procedures." More specifically, programmers must obtain approval from the BAO for the test plans, document all the test results and defects, and obtain approval from the BAO to finalize and record the test results.

CFS managers must ensure CFS employees comply with the SOX controls. In 2007, Long became the manager of CFS. In April 2009, Long discovered Baltrenas had changed an application code by authorizing "changeman packages" without proper security clearance and without obtaining BAO approval. Long gave Baltrenas a written warning, and during a meeting to discuss the warning, Baltrenas did not deny she had violated the SOX controls. Almost a year later, in March 2010, Long again discovered Baltrenas had changed an application code without obtaining BAO approval. Long again gave Baltrenas a written warning and met with her to discuss the warning. In Baltrenas's 2010 performance evaluation, Long again reiterated the need for Baltrenas to comply with the SOX controls. Long met with Baltrenas to discuss her review and stated in his declaration that during the meeting "Baltrenas told me that she could not always follow the SOX controls and that she believed she should do what was in the best interest of her business clients rather than what her managers instructed her to do."

Baltrenas maintains that sometime in 2010, "completely out of the blue, [Long] asked me: 'Do you believe in predestination?'" Baltrenas explained: "I ranted and

3

raved, as I usually do, for some minutes, voicing my endless opinion. Bottom line: to summarize my response: 'Hell, no! I am a Roman Catholic who believes in "free-will" . . . We make our own destiny!' . . . After my long and lengthy ranting, he then quietly said: 'I do'. I asked: 'What?' He quietly stated: 'I do believe in pre-destination.' " She continued: "From that day onward, Dennis Long's attitude toward me changed dramatically: 180 degrees diametrically opposed to his former friendly self." Specifically, Baltrenas claimed Long was unfair in his discipline and performance evaluations. Prior to that point, Baltrenas "would classify [their] working relationship as excellent. We got along really well. There was even a standing insider routine between us" where Baltrenas would affectionately " 'translate' " a coworker's cryptic speech for Long.

On August 8, 2011, Baltrenas complained to Kaiser about Long's alleged religiously motivated hostility toward her. During the investigation, Long said he did not remember having the conversation and, in fact, could not recall having ever discussed religion at work, although he conceded it was possible he had. Kaiser could not substantiate Baltrenas's claim the predestination conversation occurred or that Baltrenas's religious beliefs had caused Long to discriminate against her by unfairly disciplining her and giving her poor performance reviews.

In January 2011, Kaiser had "matrixed out" or loaned Baltrenas to the Medical Information Billing Services department. CFS, and specifically Long, however, maintained administrative control and supervision over Baltrenas. When Baltrenas switched departments, Kaiser, per standard operation policy, deactivated her "production access," which meant she could not "operate in the production environment." That is, Baltrenas could not access or manipulate live CFS data or systems. Baltrenas, however, could access and manipulate a "mirror" of Kaiser's live data. A "mirror" of data is an exact copy of live data. It can be manipulated and tested on without any consequences to the live data. A Kaiser employee testified programmers are generally allowed to run tests without permission on a mirror because it was like a "sandbox" "for playing around."

4

The employee noted, however, that a programmer "would run into trouble if" that person "wanted to grab any sort of data from another system" that was not a mirror.

While Baltrenas was on loan, Kaiser requested her to reengage with the CFS group to assist with an operation known as the ePRO Hawaii project. This project was designed to eliminate the overhead associated with Kaiser's Hawaii medical billing operations by creating an interface between Hawaii's outmoded software systems and a more modern application using a software called Capital Project Systems (CPS) as the information broker. Baltrenas maintains that, as was customary at Kaiser and at the direction of her supervisor, the first step she took on the ePRO Hawaii project was creating a "mock-up" or prototype. This prototype was to give the BAO "a visual representation of what [the] proposed project w[ould] be." This "general overview" would allow the BAO to have input on the project's features before programmers delved into building the "nitty-gritty" of the project's specific components. Although the parties agree Baltrenas created a prototype for the ePRO Hawaii project, they disagree how she did so. How Baltrenas built the prototype is at the center of this case.

Baltrenas suggests, but does not explicitly contend, she used a mirror to gather Northern California CPS data similar to the data that would be used in the Hawaii project. She then "jimmied up" this Northern California data to look like Hawaii data. For example, she changed "San Francisco" to "Honolulu," real customer names to "Mickey Mouse" or "Donald Duck," vendor codes from "R123" to "VXYZ," and omitted certain identifying headers. With this data, which she describes as "fake," she generated a "report" using a word processor or "ISPF."[3] It is unclear, however, exactly what this report contained. At times Baltrenas seemed to describe the report as a demonstration of what kind of end product the new system would generate, but at other times she seemed to describe it as an overview of the system itself, including what its interfaces would look like and which personnel would be entering information. Baltrenas maintains that the

---

[3] "ISPF" stands for Interactive System Productivity Facility. It is software which allows programmers to build applications.

report had "no functionality on its own" and used no "actual data" because she lacked clearance to access live data and the data she used was a "fake" version of mirrored data.

Kaiser, on the other hand, argues Baltrenas "developed a design" "and ran tests of the design using data from a version of the Capital Project System application Kaiser used in Northern California," without a testing plan or BAO approval, as required by the SOX controls. Kaiser characterizes the report Baltrenas generated as "a report of the testing she ha[d] done using the Northern California Capital Project System data."

Inexplicably, the parties failed to include this critical piece of evidence in the record. Although Baltrenas tries to cast blame on Kaiser for not including the report, she does not explain her efforts to force Kaiser to produce it during discovery and why, if Kaiser failed or refused to produce it, she did not pursue sanctions below.

Whatever the nature of this report, Baltrenas presented it during a meeting on October 6, 2011, which Long attended. Long immediately reacted negatively to it. An employee in attendance testified he saw Long do "his turtle thing" and "flinch" when Baltrenas presented the report. Long explained in his declaration, "After receiving the report, I became concerned that Ms. Baltrenas had possibly violated the SOX controls because it appeared that she had performed testing with Northern California data and prototyped software but did not have any authorizations from a BAO or BAOD and had not prepared a written test plan." Long reported his concerns to his supervisor, Robert "Rocky" Keel. Keel then consulted an "IT human resources business partner," who instructed him to investigate what actions Baltrenas had taken and whether they violated the SOX controls, and also suggested to put Baltrenas on administrative leave pending completion of the investigation. On October 13, 2011, Keel placed Baltrenas on administrative leave and independently reviewed Baltrenas's report. He assessed that Baltrenas "had made changes to the coding of the Northern California CPS application and had run a test of those coding changes as part of the CPS conversion project." He also determined Baltrenas had done this without a test plan or BAO approval. Keel concluded Baltrenas had violated SOX controls 12.14.03 and 12.15.01. During his investigation, Keel consulted with Armik Amirian, "a compliance director for Kaiser's

6

Corporate Services group," and provided her with the information he had gathered during his investigation. Amirian likewise concluded that, if the investigative findings were correct, Baltrenas had violated the SOX controls.

Keel concluded Kaiser should terminate Baltrenas because she had violated two SOX controls on the ePRO Hawaii project; had violated the SOX controls twice in the past and had been repeatedly warned about the seriousness of future noncompliance; and had made statements to Long "that she could not comply with the . . . SOX control policies and do her job and that she thought servicing her clients' needs was more important than policy compliance." A more senior manager and a vice-president agreed with Keel's recommendation and authorized him to terminate Baltrenas. Keel had Long prepare a termination memo and asked Baltrenas to meet with him and Long "to inform her of her termination." Baltrenas, however, refused to attend the meeting. Baltrenas explained, "[T]his meeting was not an opportunity for [me] to voice [my] concerns but a meeting to deliver the final punishment." Kaiser terminated Baltrenas for cause on October 27, 2011. Kaiser did not provide Baltrenas with severance benefits, as she requested, because she was not entitled them due to her termination.

Baltrenas sued Kaiser and Long on October 16, 2013. She brought five causes of action: (1) breach of implied contract; (2) breach of implied covenant of good faith and fair dealing; (3) wrongful termination in violation of public policy; (4) intentional infliction of emotional distress; and (5) unfair business practices in violation of Business and Professions Code section 17200 et seq. After discovery, Kaiser and Long moved for summary judgment or in the alternative summary adjudication. The court granted summary judgment. Baltrenas appealed.

## DISCUSSION

On appeal, Baltrenas argues triable issues of material fact remain as to whether (1) Kaiser breached its implied in fact "good cause" contract; (2) Kaiser breached its implied covenant of good faith and fair dealing; and (3) Kaiser wrongfully terminated Baltrenas in violation of public policy. Baltrenas does not argue the court improperly granted summary judgment as to the causes of action against Long. We consider those

7

arguments waived and address only the remaining causes of action against Kaiser. (*Christoff v. Union Pacific Railroad Co.* (2005) 134 Cal.App.4th 118, 126.)

We review the grant of summary judgment de novo. (*Romero v. American President Lines, Ltd.* (1995) 38 Cal.App.4th 1199, 1203 ["in a discrimination case . . . we must review the matter de novo, granting no particular deference to the trial court ruling"].) A three-part burden-shifting analysis applies in discrimination termination actions if no direct evidence of discrimination is offered. (*McDonnell Douglas Corp. v. Green* (1973) 411 U.S. 792, 802–804 [93 S.Ct. 1817] (*McDonnell Douglas*); *Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 354 (*Guz*).) Baltrenas presented no direct evidence of discrimination, therefore the burden-shifting test applies. Under *McDonnell Douglas*, the plaintiff, first, has the burden to establish a prima facie case of discrimination. (*Guz*, at pp. 354–355.) A prima facie case is established "as follows: '(1) complainant belongs to a protected class; (2) his job performance was satisfactory; (3) he was discharged; and (4) . . . his job was filled by an individual of comparable qualifications not in the protected class.' " (*Caldwell v. Paramount Unified School Dist.* (1995) 41 Cal.App.4th 189, 200 (*Caldwell*) [following *McDonnell Douglas*].) If the plaintiff establishes a prima facie case, a presumption of discrimination arises. (*Guz*, at p. 355.) Second, the burden then shifts to the defendant to rebut this presumption by demonstrating a legitimate reason for the plaintiff's termination. (*Id.* at pp. 355–356.) If the defendant establishes a legitimate reason for the plaintiff's termination, the discrimination presumption "disappears." (*Id.* at p. 356.) Third, the burden then shifts again to the plaintiff to demonstrate the allegedly legitimate reason was actually a pretext. (*Ibid.*) These inquiries "are questions of law for the trial court, not questions of fact for the jury." (*Caldwell*, at p. 201.)

## A. Kaiser did not breach any implied "good cause" contract

### 1. We assume for sake of argument Baltrenas was not an at-will employee

Kaiser argues Baltrenas was an at-will employee and it had and has no obligation to demonstrate it terminated her for cause. We need not decide this issue. Even assuming in Baltrenas's favor she and Kaiser had some kind of implied "good cause"

8

contract, she cannot demonstrate Kaiser's determination it had cause to terminate her was the result of discrimination or of an unreasonable or inherently unfair investigation.

## 2. Baltrenas made a prima facie showing

Baltrenas established a prima facie case under *McDonnell Douglas*, *supra*, 411 U.S. 792. Baltrenas easily meets the first and third elements: she belongs to a protected class as a religious individual and Kaiser discharged her. As to the second element, whether Baltrenas's performance was satisfactory, her 26-year career speaks for itself. Although Baltrenas received warnings and did not have entirely exemplary performance reviews, these alone are not enough to demonstrate unsatisfactory job performance when weighed against her 26-year career. (*Caldwell*, *supra,* 41 Cal.App.4th at p. 197 [" 'The amount [of evidence] that must be produced in order to create a prima facie case is "very little" ' "].) As to the fourth element, whether a similarly qualified individual who was not in the protected class filled her job, the record is unclear. Baltrenas did not present evidence or argument she was replaced; on the other hand, Kaiser did not argue either that she was replaced by someone also in the protected class or she was not replaced. We will assume for the sake of argument that Baltrenas was replaced. Finally, Baltrenas needed to demonstrate by a preponderance of the evidence that her termination was at least in part motivated by discrimination. (*Watson v. Department of Rehabilitation* (1989) 212 Cal.App.3d 1271, 1290.) Although the discrimination evidence she presented ultimately failed, Baltrenas did offer her declaration, deposition testimony, and other documents which might have demonstrated discrimination. Baltrenas established a prima facie case of discrimination.

## 3. Kaiser rebutted the discrimination presumption

Kaiser conducted an appropriate investigation and honestly determined Baltrenas had violated company policy.

In "good cause" termination actions, the question "is not 'Did the employee *in fact* commit the act leading to dismissal?' " (*Cotran v. Rollins Hudig Hall Internat., Inc.* (1998) 17 Cal.4th 93, 107 (*Cotran*).) Rather, the question is, " 'Was the factual basis on which the employer concluded a dischargeable act had been committed reached honestly,

9

after an appropriate investigation and for reasons that are not arbitrary or pretextual?' " (*Ibid*.) This inquiry "focuses on the *employer's response* to allegations of misconduct" rather than on "the ultimate truth of the employee's alleged misconduct." (*Ibid*.) Courts do not compel any precise type of investigation "as long as the process is inherently fair." (*King v. United Parcel Service, Inc.* (2007) 152 Cal.App.4th 426, 439 (*King*).)

Kaiser conducted an appropriate investigation and honestly concluded Baltrenas had committed a dischargeable act. Long immediately "flinched" when he saw Baltrenas's report. Despite repeated warnings about the vital importance of complying with the SOX controls, it appeared to Long that Baltrenas had, yet again, acted according to her beliefs that she could disregard the SOX controls when she felt they got in her way. Long claims that during the meeting "Baltrenas indicated she had already completed a good portion of the coding necessary to the CPS system for the remediation effort. The CPS system is a SOX scope application. In this meeting, Laima indicated that the coding changes she made to the CPS system are ready to move to production. However, No BAO approval to start work has been obtained. Laima has created a development changeman package FSCP000284 for these coding changes. [¶] . . . [¶] Screen Prints of the changeman package and associated components are captured below." As noted, for some reason the screen shots of the report were not included in the record.

Long sent the report to Keel, his supervisor, and explained why he believed Baltrenas had violated SOX controls. Keel replied to Long, "the fact that coding was done before BAO/D approval . . . is a real issue. This violates SOX processes . . . specifically control 12.14.03—Approval to start work (which we have defined as approval of requirements by the BAO/D)." Keel then continued: "Has any testing taken place yet? If so (I would hope so if the changes are already staged in a CMAN package. . .), and there isn't a Test Plan approved by you or your lead, that also violates control 12.15.01 which in our process has a definite sequence of approvals requirements to make sure the test plan is approved by IT Management PRIOR to any testing taking place." Keel also agreed the SOX controls covered CPS applications. Keel then consulted with Amirian, a compliance expert, who expressed that if indeed Baltrenas had

10

done what Long and Keel thought she had, her actions were "highly risky and noncompliant." Keel made his own assessment and was not acting as Long's "cat's paw."

Baltrenas challenges the sufficiency of this investigative process, arguing that the SOX controls apply only to live data, and because she lacked a security credential to access live data it was *impossible* for Kaiser to have concluded she violated the cited SOX controls. Baltrenas's argument is flawed in three respects. First, Baltrenas cited no evidence that the SOX controls apply only to live data. Moreover, the only evidence in the record relating to this issue contradicts her assertion. For instance, Long, Keel, and Amirian all indicated that "*any*" testing using CPS applications must comply with the SOX controls. In addition, the policy itself states that the "primary goal" of these controls "is to manage the initiation, review, *testing*, approval, and implementation and documentation of *all proposed* changes," in part, to "[e]nsure changes do not adversely impact key financial data and controls." (Italics added.) More specifically, SOX control 12.15.01 requires that "[m]anagement *ensures* that testing occurs in a *non-production environment* to ensure the integrity of production data as documented in the Change Management Policy and Procedures." (Italics added.) A reasonable interpretation of this language is that programmers needed approval before running any tests to ensure that the tests were indeed in a nonproduction environment and could not affect live data. Absent evidence the SOX controls applied as narrowly as Baltrenas argues, we will not accept Baltrenas's bald statement they did.

Second, despite Baltrenas strongly implying she used a mirror to capture the Northern California data, there is no evidence in the record proving her assertion; nor is there any evidence proving exactly how she obtained the data. Although Kaiser does not argue Baltrenas fraudulently obtained the data, Baltrenas also cannot validate her claims that she was permitted to access and "massage" the Northern California data as she did. Third, Baltrenas ran tests without approval on real, but altered, CPS data. It is unclear how she ran these tests, but presumably she did so using software with an underlying code. In fact, Long reported that Baltrenas herself had "indicated she had already

11

completed a good portion of the coding necessary to the CPS system," and those coding changes were "ready to move to production." Long's e-mail to Keel specifically detailing that "Laima has created a development changeman package FSCP000284 for these coding changes" also supports that Baltrenas had actually performed some coding and Long was not merely guessing or accusing that she had. Even if Baltrenas misspoke or Long misheard whether she had actually written code to test, Long reasonably could have concluded Baltrenas had run tests using coding on real, albeit manipulated, data based on Baltrenas's statements, her report, and the fact that she admitted she may have used ISPF (a software capable of building applications) in her work.

Baltrenas also notes many ways the investigation could have been different and, in her opinion, better. The standard, however, is not whether the investigation was perfect or how other companies perform investigations or if another investigative method existed which would have produced results more favorable to Baltrenas. The standard is whether Kaiser's investigation was "appropriate" and "honest." (*Cotran*, *supra*, 17 Cal.4th at p. 107.) We conclude that it was. Keel independently investigated Long's concerns about how Baltrenas had created her report and consulted with a compliance officer to double-check his findings. His recommendation to terminate Baltrenas was accepted by not one, but two other senior executives, Jim Stevens, senior manager/director of corporate services, and Steve Stock, vice-president of corporate services BIO Financial Portfolio. These steps were reasonable, and it would be inappropriate for this court to dictate precisely what additional investigative steps could or should have been taken. "Flexibility is the signature lesson from *Cotran*," and, again, the "Supreme Court is unwilling to compel employers to undertake a precise type of investigation as long as the process is inherently fair." (*King*, *supra*, 152 Cal.App.4th at p. 439.)

Baltrenas's further complaints about the investigative process are therefore unavailing. For example, Baltrenas complains that she was not given a chance to defend herself and cites *Silva v. Lucky Stores, Inc.* (1998) 65 Cal.App.4th 256 for the proposition that Kaiser was obligated to afford her such an opportunity. Baltrenas *was*, however, afforded such an opportunity, but she chose not to take it: When Long and Keel asked to

12

meet with her, she refused. We will not say Kaiser's investigation was unreasonable merely because Kaiser did not afford Baltrenas an opportunity to defend herself earlier in the investigative process and did not force Baltrenas to attend a meeting to defend herself. As another example, Baltrenas complains Kaiser failed to interview other employees, particularly her immediate supervisor, who stated during his deposition that his initial impression of her report was that it was not in violation of the SOX controls. This supervisor, however, was admittedly not knowledgeable about the SOX controls and, in any event, his opinion would have added little to an investigation where three other higher level employees had determined, based on their SOX expertise and investigation, that Baltrenas had violated the SOX controls.

Although perhaps not the most extensive, Kaiser's investigation was inherently fair and, based on the evidence in the record, its conclusion Baltrenas violated the SOX controls was reasonable, even if that conclusion could have been ultimately incorrect.

**4.     Baltrenas failed to demonstrate her termination was pretext**

Baltrenas's evidence Long's religiously motivated animus against her caused her termination is speculative, at best. First, Long does not remember having any conversations about religion at work, including one about predestination with Baltrenas. Second, Kaiser could not substantiate Baltrenas's claim this conversation occurred or that as a result of it Long began to religiously discriminate against Baltrenas. Third, the record does not contain any evidence that Keel, or any others involved in the investigation, knew about the conversation or Long's alleged discrimination or that their own animus motivated their actions. Fourth, the discrimination Baltrenas complains of before her termination appears to be nothing more than routine feedback and discipline. For example, Baltrenas characterizes Long's warning to her about her disruptive behavior during a meeting as unfair and wrongly motivated, but Baltrenas is admittedly prone to "long and lengthy ranting," and Long gave specific examples of her behavior he considered to be disruptive. Fifth, Baltrenas offers no evidence of further conversations about, comments concerning, or other employees' reactions to her religious beliefs.

13

Baltrenas also argues that Long's June 20, 2011 written warning to her included a reprimand for taking "PTO" (paid time off) without complying with proper notification and approval procedures, even though the day she requested was Good Friday and Long was not her immediate supervisor. Long, however, listed several other instances of Baltrenas's noncompliance, and nothing in the record suggests this reprimand was unjustified or improperly motivated.

**B.      Baltrenas's duplicative claim for breach of the implied covenant of good faith and fair dealing fails**

Baltrenas argues she expected to receive Kaiser's severance package; Kaiser presented no evidence refuting her expectation; in order to deny her the expected severance package, Kaiser needed to prove that it fired Baltrenas for "cause," as defined by Kaiser's Benefits Plan; and, finally, Kaiser did not have "cause" to fire Baltrenas, but did so to avoid providing her with a severance package. We disagree. To start, as a general matter of law, an implied covenant claim is superfluous and disregarded where it is based on the same acts and contract as in a companion breach of contract claim. (*Careau & Co. v. Security Pacific Business Credit, Inc.* (1990) 222 Cal.App.3d 1371, 1395.) Here, Baltrenas's attempt to distinguish her implied covenant claim fails. Baltrenas is essentially arguing in both claims that Kaiser did not have good cause to terminate her. As described above, Kaiser's reasonable investigation and honest conclusion Baltrenas violated important internal policies were sufficient reasons to find Kaiser had good cause. In addition, Kaiser's Benefits Plan defines "cause" as including, but not limited to, "poor performance, . . . willful violation of the employer's policies or rules of conduct; insubordination; . . . or other misconduct." Nothing in this definition is exclusive of the definition of "good cause," which underpinned her breach of contract cause of action. (*Cotran*, *supra*, 17 Cal.4th at pp. 107–108 [defining " 'good cause' " as "fair and honest reasons, regulated by good faith on the part of the employer, that are not trivial, arbitrary or capricious, unrelated to business needs or goals, or pretextual"].) We affirm the court's grant of summary judgment on this issue because Baltrenas's implied

covenant claim is superfluous and fails for the same reasons her underlying breach of contract claim failed.

## C. Baltrenas's derivative claim for wrongful termination in violation of public policy likewise fails

Baltrenas's claim for wrongful termination in violation of public policy is "tethered" to her discrimination claim. (See *Estes v. Monroe* (2004) 120 Cal.App.4th 1347, 1355.) Because her discrimination claim failed, so does her claim for wrongful termination in violation of public policy. (*Hanson v. Lucky Stores, Inc.* (1999) 74 Cal.App.4th 215, 229.)

## DISPOSITION

The judgment is affirmed. Kaiser Foundation Hospitals and Dennis Long are awarded their costs on appeal under California Rules of Court, rule 8.278.

NOT TO BE PUBLISHED.


LUI, J.

We concur:


CHANEY, Acting P. J.


JOHNSON, J.

15