Filed 6/21/21  Allum v. San Joaquin County Employees' etc. CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| EDWARD ALLUM et al., | C090833 |
| Plaintiffs and Respondents, | (Super. Ct. No. STKCVUBC201710696) |
| v. | |
| SAN JOAQUIN COUNTY EMPLOYEES' RETIREMENT ASSOCIATION et al., | |
| Defendants and Respondents. | |

Plaintiffs Edward Allum and Pauline Toy are retired public employees who receive retirement benefits from the San Joaquin County Employees' Retirement Association (County Retirement Association).  They bring this action against the County Retirement Association and its Board of Retirement on behalf of themselves and a class of individuals who had received supplemental retirement benefit payments pursuant to a 2001 settlement agreement.  The payments were suspended in 2006 for more than a year before being reinstated and then suspended again in 2017.  Plaintiffs appeal from the trial

1

court's entry of judgment in favor of defendants and cross-defendant the County of San Joaquin (collectively, respondents) after the court granted respondents' motions for summary judgment. On appeal, plaintiffs contend summary judgment was improper because: (1) the trial court erred in sustaining objections to the declaration of plaintiffs' expert actuary, (2) the court erred in overruling plaintiffs' objections to the declaration of defendants' actuary, (3) plaintiffs presented triable issues of fact as to their breach of contract claim, and (4) plaintiffs' claims are timely. Because we conclude the trial court did not err in concluding plaintiffs' action is barred by the statute of limitations, we need not address plaintiffs' other assertions of error. We will affirm the judgment.

## I. BACKGROUND

*A.    Factual Background*

The County Retirement Association is a retirement system that was established by the County of San Joaquin under the County Employees Retirement Law of 1937 (CERL; Gov. Code, § 31450 et seq.).[1] "CERL governs the pension systems maintained by many of the state's counties. Each county system is administered by its own retirement board, which is tasked with implementing CERL's provisions. Under CERL, the amount of an employee's pension benefit is determined as a percentage of the 'compensation earnable' received by the employee during a representative year of county employment." (*Alameda County Deputy Sheriff's Assn. v. Alameda County Employees' Retirement Assn.* (2020) 9 Cal.5th 1032, 1052.)

"Retirement benefits 'are funded by employer contributions, employee contributions, and investment earnings on monies deposited in the fund.' " (*O'Neal v. Stanislaus County Employees' Retirement Assn*. (2017) 8 Cal.App.5th 1184, 1199.) The County of San Joaquin is the largest employer of the County Retirement Association's

---

[1] Undesignated statutory references are to the Government Code.

members.  The Board of Retirement has "sole and exclusive fiduciary responsibility over the assets of the . . . system."  (Cal. Const., art. XVI, § 17, subd. (a).)  Consistent with its fiduciary duties, the Board of Retirement has "the sole and exclusive power to provide for actuarial services in order to assure the competency of the assets of the . . . system."  (*Id.*, § 17, subd. (e).)  The board adopts an actuarial valuation every year on the recommendation of its consulting actuary.  The board uses the actuarial valuations, as modified over time, to establish the contribution rate owed by the County and other participating employers to cover any unfunded actuarially accrued liability, as well as the normal rate of contributions owed by the participating employers and the County Retirement Association's active members.

This litigation arises out of a settlement agreement approved by a court in August 2001, and entered into by the County and its board of supervisors, defendants, the San Joaquin County Sheriff's Association, a class of "all retirees, deferred retirees, beneficiaries, and present and future employees who are or who become members of the [County Retirement Association]," and others to settle litigation based on our Supreme Court's decision in *Ventura County Deputy Sheriffs' Assn. v. Board of Retirement* (1997) 16 Cal.4th 483, superseded by statute on another ground as stated in *Marin Assn. of Public Employees v. Marin County Employees' Retirement Assn.* (2016) 2 Cal.App.5th 674, 691, fn. 14, which had interpreted "compensation earnable" under section 31461 for purposes of calculating the amount of a pension.  (*Ventura County Deputy Sheriffs' Assn. v. Board of Retirement*, *supra*, at p. 487.)

As relevant to this proceeding, section 20 of the settlement agreement provides that "the Board of Retirement shall establish a reserve account in the Retirement Fund for the purpose of providing supplemental benefits" to a subclass of individuals (or their beneficiaries) who retired on or after April 1, 1982, and before January 1, 2001.  The supplemental benefits payable to these retirees or their surviving beneficiaries are in

addition to other retirement benefits and are $10 per month for each year of service up to a maximum payment of $300 per month.

The settlement agreement explained the funding source for this benefit as follows: "The supplemental benefits by this Section 20 shall be funded out of the UER reported to the Board of Retirement by its actuaries for calendar years 1999 and 2000 including any litigation reserves created by transfers from such UER. The Board of Retirement shall transfer $16.2 million from such UER to the supplemental benefit reserve account established by the Board of Retirement pursuant to this Section 20 to fund this supplemental benefit. The Board of Retirement's actuaries have determined that an additional approximate[ly] $16.2 million will be necessary to fully fund this benefit. To the extent that UER for the calendar years 1999 and 2000 are insufficient to fund the entire present value cost of this benefit as estimated by the Board of Retirement's actuaries, taking into account the appropriations and allocations from such UER necessary to fund the other benefits provided by this Settlement Agreement, the amount transferred by the Board of Retirement to this supplemental benefit reserve account shall be used to pay the monthly amounts calculated for this benefit until such funding is exhausted, at which time the supplemental benefit shall be suspended until funding is available as described hereafter in this Section 20. In anticipation of such a deficiency in the present funding of the cost of this supplemental benefit, the Board of Retirement *shall transfer funds from each UER reported to it by its actuaries for calendar years after 2000* remaining after deduction of 'True-up Costs' but before any 'UER Split' until this benefit is fully funded." (Italics added.)

The agreement specifies "[t]he priority of transfers from UER existing for calendar year 2001 and thereafter shall be as follows:

"(1) All transfers required by law, including but not limited to . . . interest posting to reserve accounts, administrative costs, and investment management fees;

"(2) All transfers necessary to fund 'True-up Costs' . . . ;

4

"(3)  All transfers necessary to fund the benefit prescribed by Section 20."[2]

The "UER" is defined in the settlement agreement as the "unapportioned earnings reserve, a reserve account established by the Board of Retirement . . . pursuant to [s]ections 31592 and 31592.2."  Under section 31592, "[e]arnings of the retirement fund during any year in excess of the total interest credited to contributions and reserves during such year shall remain in the fund as a reserve against deficiencies in interest earnings in other years, losses on investments and other contingencies, except as provided in Sections 31529.5 and 31592.2."  Section 31592.2, subd. (a) in turn, provides that "when such surplus exceeds 1 percent of the total assets of the retirement system, the board may transfer all, or any part, of such surplus in excess of 1 percent of the said total assets into county advance reserves for the sole purpose of payment of the cost of the benefits described in this chapter."  Historically, the County Retirement Association placed up to 3 percent of the market value of its funds in a contingency reserve pursuant to these provisions, and then any additional money flowed into the UER.  The UER is reestablished yearly.

The settlement agreement required the Board of Retirement to give written notice to all employee organizations of board meetings regarding distribution from the UER and provide them with relevant materials.  Under CERL, a recognized employee organization is also entitled to advanced notice of any use of excess funds in the retirement system.  (§ 31592.5.)  Retired Public Employees of San Joaquin County (Retired Employees

---

[2]  "True-Up Costs" are defined as "the actuarially determined costs of the benefits extended or implemented by Sections 19, 20, 21, and 22 of this Settlement Agreement, as those costs are recalculated from time to time by the actuaries retained by the Board of Retirement."  "UER Split" is "the division of discretionary amounts in the UER, after mandatory transfers, in a pro-rata fashion calculated by averaging the ratio of employer contributions to employee contributions (net of refunds to withdrawing members) to the [County Retirement Association] for the calendar year for which a UER occurs and the immediately preceding four calendar years."

Organization) is a recognized retiree organization. (§ 31471.5.) About 45 percent of retirees are dues paying members of the Retired Employees Organization. A member of its board has often sat on the Board of Retirement as the elected retired member.

In September 2001, the Board of Retirement approved the transfer of $16.2 million pursuant to the settlement agreement into the reserve for the supplemental benefits.

In 2006, payments of the supplemental benefits were suspended after funding in the reserve was exhausted.

In April 2007, the Retired Employees Organization's newsletter explained that the organization had retained the services of the attorney who originally negotiated the settlement agreement: "He believes, as do we, that the supplemental benefit should be restored prior to the County recovering their increased costs of retirement due to the market downturn in 2000. . . . [¶] . . . We believe the Retirement Fund's actuary will report in August that sufficient excess funds will exist to restore our supplemental benefit and substantially fund it for the future. If we are correct, this issue needs to be resolved prior to any funds being distributed. [¶] We will continue to meet with County Counsel and the Retirement Board to obtain an agreement that no funds will be distributed until it is resolved. Short of an agreement, we and the Deputy Sheriff's Association are prepared to go to court to tie up these funds and return to the San Francisco Superior Court that approved the 'Ventura' Agreement in 2000 to request that they render a decision on our position." In the same month, attorney Richard Chiurazzi, who also represents plaintiffs in this action, sent a letter to the County Retirement Association regarding funding of the supplemental benefit. In response to his inquiry, he received a letter stating that the supplemental benefit was funded with the initial $16.2 million, and setting forth the declining year end balances for the reserve account from 2001 to 2006. The County Retirement Association estimated about $3.8 million per year was required to fund the supplemental benefit.

6

In August 2007, the President of the Retired Employees Organization sent a letter to the Board of Retirement seeking reinstatement of the benefit and suggesting the use of certain funds to do so. The letter stated the Retired Employees Organization "represents all current and future County retirees." The letter also referenced an opinion by Chiurazzi that a contingency reserve in excess of 1 percent is not required by law. The referenced opinion begins, "Your organization requested a legal opinion concerning the Ventura Settlement Agreement as it relates to reinstatement of the supplemental benefit. After reviewing all of the applicable documents, the relevant Government Code sections, discussing the issue with an expert consultant and reviewing the Ventura Settlement Agreement, it is my opinion that suspension of the supplemental benefit at this time violates the Settlement Agreement and that it must be reinstated as soon as possible." Chiurazzi opined that "money transferred to the contingency reserve in excess of 1% of fund assets is not required by law and is in fact excess earnings which legally should have gone to pay the supplemental benefit."

At a board meeting in September 2007, Chiurazzi disagreed with counsel for the County regarding whether the Board of Retirement is required to use the funds in excess of the 1 percent reserve and how those funds are to be used.

In October 2007, the Board of Retirement agreed to a one-time transfer of the amount in the contingency reserve that was in excess of 1 percent (about $2.5 million) to the supplemental benefit reserve, and the supplemental benefit payments resumed at the end of 2007. The following year, the Board of Retirement explained in a newsletter to retirees that it had agreed to "waive" its policy of maintaining a contingency reserve of 3 percent. However, there were only enough funds to continue payments through September 1, 2008. In 2008, additional transfers from the UER were made into the supplemental benefit reserve. No further transfers were made. The supplemental benefit payments stopped again in March 2017 and have not resumed.

*B.     Procedural Background*

This action was filed in 2017.  The trial court certified a class of individuals who retired on or after April 1, 1982, and before January 1, 2001, and their beneficiaries, who had received supplemental benefit payments from the County Retirement Association. Allum and Toy are the named plaintiffs in the operative complaint.  The complaint purports to set forth causes of action for:  (1) declaratory and injunctive relief, (2) petition for writ of mandate, (3) accounting, (4) breach of contract, and (5) breach of the covenant of good faith and fair dealing.  As relevant to this appeal, the complaint alleges defendants breached the settlement agreement by failing to adequately fund and then pay their obligations to plaintiffs.  The complaint alleged there were sufficient funds to avoid suspension of their supplemental benefit payments, but defendants placed more than 1 percent in the contingency reserve in 2001, 2002, 2003, 2006, 2007, 2009, and 2010; placed an extra $3 million or more each year into a contingency reserve account for administrative budget expenses; placed funds into a "restricted UER" in 2004, 2005, 2006, and 2007; and left money in the UER in 2001 and 2009 that should have been used to fund the supplemental benefit payment.  The complaint further alleges plaintiffs first learned in 2017 that there were sufficient funds to have avoided any suspension of these payments.

Defendants cross-complained against the County.  Defendants and the County moved for summary judgment on the basis that there were no triable issues of material fact as to any of plaintiffs' causes of action and plaintiffs' claims were barred by the statute of limitations and laches.  The trial court granted respondents' motions.  The court concluded all of plaintiffs' claims failed, and plaintiffs had not established any entitlement to an accounting or a writ of mandate.  The trial court also determined plaintiffs' claims were barred by the statute of limitations.  The court concluded plaintiffs could have conducted the same research in 2007 that they did in 2017, and plaintiffs' counsel commenced discussions regarding the alleged improper funding of the reserve

8

but failed to properly pursue remedies to seek a resolution. The court granted the motions and entered judgment accordingly.

Plaintiffs filed a timely appeal.

## II. DISCUSSION

*A.     Standard of Review*

We begin by summarizing several principles that govern the grant and review of summary judgment motions under Code of Civil Procedure section 437c.

"The purpose of the law of summary judgment is to provide courts with a mechanism to cut through the parties' pleadings in order to determine whether, despite their allegations, trial is in fact necessary to resolve their dispute." (*Aguilar v. Atlantic Richfield Co*. (2001) 25 Cal.4th 826, 843.) "A trial court properly grants summary judgment where no triable issue of material fact exists and the moving party is entitled to judgment as a matter of law." (*Merrill v. Navegar, Inc*. (2001) 26 Cal.4th 465, 476; see also Code Civ. Proc., § 437c, subd. (c).) "The materiality of a disputed fact is measured by the pleadings [citations], which 'set the boundaries of the issues to be resolved at summary judgment.' " (*Conroy v. Regents of University of California* (2009) 45 Cal.4th 1244, 1250.)

A defendant may move for summary judgment on the ground there is an affirmative defense to the action. (Code Civ. Proc., § 437c, subds. (o)(2), (p)(2); see also *Aryeh v. Canon Business Solutions, Inc*. (2013) 55 Cal.4th 1185, 1191 [statute of limitations is an affirmative defense].) Once the defendant meets its initial burden of production by making a prima facie showing that the affirmative defense applies, the burden shifts to the plaintiff to make a prima facie showing of the existence of a triable issue of material fact regarding the defense. (*Aguilar v. Atlantic Richfield Co., supra*, 25 Cal.4th at p. 850; *Jessen v. Mentor Corp*. (2008) 158 Cal.App.4th 1480, 1484-1485.)

"While we must liberally construe plaintiff's showing and resolve any doubts about the propriety of a summary judgment in plaintiff's favor, plaintiff's evidence

9

remains subject to careful scrutiny. [Citation.] We can find a triable issue of material fact 'if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof.' " (*King v. United Parcel Service, Inc*. (2007) 152 Cal.App.4th 426, 433.) "While resolution of the statute of limitations issue is normally a question of fact, where the uncontradicted facts established through discovery are susceptible of only one legitimate inference, summary judgment is proper." (*Jolly v. Eli Lilly & Co*. (1988) 44 Cal.3d 1103, 1112.)

Moreover, we must also keep in mind " '[a] judgment or order of the lower court is *presumed correct*' " and " 'error must be affirmatively shown. This is not only a general principle of appellate practice but an ingredient of the constitutional doctrine of reversible error.' " (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 564.) "Under this principle, [appellants] bear the burden of establishing error on appeal, even though [respondents] had the burden of proving [their] right to summary judgment before the trial court. [Citation.] For this reason, our review is limited to contentions adequately raised in the [appellants]' briefs." (*Paslay v. State Farm General Ins. Co*. (2016) 248 Cal.App.4th 639, 645.) In particular, " '[t]he reviewing court is not required to make an independent, unassisted study of the record in search of error or grounds to support the judgment.' [Citations.] It is the duty of counsel to refer the reviewing court to the portion of the record which supports appellant's contentions on appeal. [Citation.] If no citation 'is furnished on a particular point, the court may treat it as waived.' " (*Guthrey v. State of California* (1998) 63 Cal.App.4th 1108, 1115.) Moreover, any arguments raised or only supported by authority on reply have been waived. (*People v. Baniqued* (2000) 85 Cal.App.4th 13, 29.)

*B.*      *Statute of Limitations*

Plaintiffs contend the trial court erred in concluding their claim for breach of contract was barred by the statute of limitations.**3**

The statute of limitations for a breach of a written contract is four years.  (Code Civ. Proc., § 337, subd. (a).)  The limitations period "runs from the moment a claim accrues." (*Aryeh v. Canon Business Solutions, Inc.*, *supra*, 55 Cal.4th at p. 1191.)  "Generally speaking, a cause of action accrues at 'the time when the cause of action is complete with all of its elements.' " (*Fox v. Ethicon Endo-Surgery, Inc.* (2005) 35 Cal.4th 797, 806.)

Plaintiffs measure the limitations period from the two dates on which their supplemental benefit payments were suspended.  First, they contend they were injured in 2017 when these payments were suspended for the second time, and their claims continue to accrue monthly.  Second, they assert their claims with respect to the suspension of payments in 2006 were timely under the discovery rule.

With respect to the suspension of payments in 2017 and their underlying assertion that their breach of contract claim should be separated into two time periods for statute of limitations purposes, plaintiffs rely on case law explaining that "[t]he right to receive periodic payments under a pension is a continuing one [citation], and any time limitation

---

**3** Plaintiffs' opening brief states in passing that the trial court wrongly concluded laches barred their claims.  Again, any arguments raised or only supported by authority on reply have been waived.  (*People v. Baniqued*, *supra*, 85 Cal.App.4th at p. 29.)  Further, a cause of action for breach of contract that seeks damages is an action at law that is not subject to the equitable defense of laches.  (*Abbott v. City of Los Angeles* (1958) 50 Cal.2d 438, 461-462, superseded by statute on other grounds as explained in *Benson v. City of Los Angeles* (1963) 60 Cal.2d 355, 364.)  To the extent laches would be applicable to any other aspect of plaintiffs' operative complaint, they have not identified it or established any error.  "We are not required to examine undeveloped claims or to supply arguments for the litigants." (*Allen v. City of Sacramento* (2015) 234 Cal.App.4th 41, 52.)

11

upon the right to sue for each instalment necessarily commences to run from the time when that instalment actually falls due." (*Dillon v. Board of Pension Comrs. of City of Los Angeles* (1941) 18 Cal.2d 427, 430.)  Plaintiffs similarly invoke the theory of continuous accrual, which "applies whenever there is a continuing or recurring obligation," and provides that each new breach "may be treated as an independently actionable wrong with its own time limit for recovery." (*Aryeh v. Canon Business Solutions, Inc*., *supra*, 55 Cal.4th at p. 1199.)  "To determine whether the continuous accrual doctrine applies here, we look not to the claim's label . . . but to the nature of the obligation allegedly breached." (*Id*. at p. 1200.)  Plaintiffs' breach of contract claim is not correctly premised on the right to receive a periodic payment because the settlement agreement did not guarantee payments every month.  Indeed, it specifies payments would be suspended when funding was exhausted.  Plaintiffs' claim for breach of contract alleges a failure to fund the supplemental benefit as set forth in the agreement, which then resulted in an unnecessary suspension of the payment.  Plaintiffs contend their claim did not accrue at any of the points at which defendants failed to fund the supplemental benefit, but rather when they were injured by the suspension of the payments.  This is incorrect.  "[A] cause of action for breach of contract ordinarily accrues at the time of breach regardless of whether any substantial damage is apparent or ascertainable." (*Menefee v. Ostawari* (1991) 228 Cal.App.3d 239, 246; accord *Ram's Gate Winery, LLC v. Roche* (2015) 235 Cal.App.4th 1071, 1084; see also 3 Witkin, Cal. Procedure (5th ed. 2020) Actions, § 520, p. 664 ["A cause of action for breach of contract ordinarily accrues at the time of breach, and the statute begins to run at that time regardless whether any damage is apparent or whether the injured party is aware of his or her right to sue"].)  "While incurring a loss has always been a prerequisite to accrual of a cause of action in tort, it has never been a requirement in contract law." (*Tabachnick v. Ticor Title Ins. Co*. (1994) 24 Cal.App.4th 70, 76.)  The difference occurs because "[f]or the breach of a contract an action lies, though no actual damages be sustained." (*McCarty v. Beach*

12

(1858) 10 Cal. 461, 464.) "The maxim that the law will not be concerned with trifles does not, ordinarily, apply to violation of a contractual right. [Citation.] Accordingly, nominal damages, which are presumed as a matter of law to stem merely from the breach of a contract [citation], may properly be awarded for the violation of such a right." (*Sweet v. Johnson* (1959) 169 Cal.App.2d 630, 632-633; see Civ. Code, § 3360.) Likewise, a plaintiff can recover for damages that "would be likely" to result from the breach. (Civ. Code, § 3300.)

The complaint alleges breaches of contract that occurred more than four years before this action was filed. Thus, respondents met their initial burden of demonstrating plaintiffs' claims are barred by the statute of limitations. (*NBCUniversal Media, LLC v. Superior Court* (2014) 225 Cal.App.4th 1222, 1231-1232.) At that point, the burden shifted to plaintiffs to demonstrate their claims survived based on a nonstatutory exception to the limitations period. (*Id.* at p. 1232; *Aryeh v. Canon Business Solutions, Inc.*, *supra*, 55 Cal.4th at p. 1197.)

Plaintiffs argue their claims for breach of contract are timely based on the discovery rule, an exception to the general rule of accrual that has been applied to breach of contract actions involving fiduciary relationships and "provides that a cause of action does not accrue until the plaintiff discovers, or reasonably should discover, the existence of the cause of action." (*Krieger v. Nick Alexander Imports, Inc.* (1991) 234 Cal.App.3d 205, 221.)

As set forth above, the Board of Retirement has "sole and exclusive fiduciary responsibility over the assets of the . . . system." (Cal. Const., art. XVI, § 17, subd. (a).) Further, board members "shall discharge their duties with respect to the system solely in the interest of, and for the exclusive purposes of providing benefits to, participants and their beneficiaries, minimizing employer contributions thereto, and defraying reasonable expenses of administering the system. A retirement board's duty to its participants and their beneficiaries shall take precedence over any other duty." (*Id.*, § 17, subd. (b).)

13

Plaintiffs assert that because defendants owed them a fiduciary duty, the limitations period did not run until plaintiffs actually discovered the underlying facts. They rely on *Eisenbaum v. Western Energy Resources, Inc*. (1990) 218 Cal.App.3d 314, which, as this court has previously explained, "held that actual notice was required to trigger the limitations period under Corporations Code section 25507, subdivision (a) for two reasons.  First, the case involved a fiduciary relationship.  The court noted, 'Where a fiduciary obligation is present, the courts have recognized a postponement of the accrual of the cause of action until the beneficiary has knowledge or notice of the act constituting a breach of fidelity.  [Citations.]  The existence of a trust relationship limits the duty of inquiry.' (*Eisenbaum*, *supra*, at p. 324.) . . .  Second, the *Eisenbaum* court interpreted the language of the statute at issue in that case as requiring actual knowledge of the facts: 'The critical focus here is found in the language of the section 25507, subdivision (a), which requires "*discovery . . . of the facts*." (Italics added.)  The statute requires Eisenbaum's *actual knowledge of the facts before the one-year statute commences to run*.  By its plain language, the statute requires actual knowledge, not just "inquiry notice." ' (*Eisenbaum, supra*, at p. 325, fn. omitted.)  *Eisenbaum*'s discussion of inquiry notice in this context has, however, been subsequently disregarded as dicta.  [Citation.] . . .  [W]e find the discussion of inquiry notice to be unpersuasive, [and] we decline to apply *Eisenbaum*." (*Yuba City Unified School Dist. v. State Teachers' Retirement System* (2017) 18 Cal.App.5th 648, 657.)

Rather, we must follow our Supreme Court, and it has explained that, even where a fiduciary duty exists, if a plaintiff "became aware of facts which would make a reasonably prudent person suspicious, she had a duty to investigate further, and she was charged with knowledge of matters which would have been revealed by such an investigation." (*Miller v. Bechtel Corp*. (1983) 33 Cal.3d 868, 875.)  "A person in a fiduciary relationship may relax, but not fall asleep." (*Alfaro v. Community Housing Improvement System & Planning Assn., Inc*. (2009) 171 Cal.App.4th 1356, 1394.)

14

"In order to rely on the discovery rule for delayed accrual of a cause of action, '[a] plaintiff whose complaint shows on its face that his claim would be barred without the benefit of the discovery rule must specifically plead facts to show (1) the time and manner of discovery *and* (2) the inability to have made earlier discovery despite reasonable diligence.' " (*Fox v. Ethicon Endo-Surgery, Inc.*, *supra*, 35 Cal.4th at p. 808.) The trial court concluded plaintiffs could have conducted the same research in 2007 that they did in 2017. Plaintiffs do not dispute this conclusion. Rather, they contend they had no duty to make this investigation. We disagree.

Here, the operative complaint alleges that, in 2005, plaintiffs were told there was insufficient money to fund the supplemental benefit and no excess earnings had been available beyond the initial $16.2 million. The complaint also alleges that, "[i]n mid-2007 attorney Richard Chiurazzi was consulted and asked to issue a legal opinion in which he concluded the Settlement Agreement was *violated* by placing more than 1% of the fund assets in the contingency reserve." (Italics added.) As set forth above, plaintiffs allege defendants breached the settlement agreement by, among other allegations, keeping funds in excess of 1 percent in the contingency reserve in 2001, 2002, 2003, 2006, 2007, 2009, and 2010. They allege they first learned in 2017 that there were funds to pay the benefit in 2006 and 2007.

In 2007, the Retired Employees Organization's newsletter told retirees that the organization had retained the services of the attorney who originally negotiated the settlement agreement and that litigation might be necessary. Even after payments resumed, the issue of the contingency reserve was raised again at an October 2008 meeting of the Board of Retirement in which an attorney for the Retired Employees Organization "added that the retirees were prepared to take legal action to require the Board to draw[] down to the [1] percent." Plaintiffs contend "[t]hey did not discover, and had no reason to discover, [d]efendants' egregious pattern of misconduct from 2002 onward until their subsequent investigation in 2016 and 2017." To support this

15

statement, plaintiffs cite declarations from members of the Retired Employees Organization board who explained that, prior to this time, they were told there was no excess earnings or UER to fund the benefit and they and others did not know of any UER or contingency reserve money in the 2001 and 2009 financial records of the County Retirement Association. In other words, plaintiffs produced evidence that certain individuals were unaware of some of the facts that form the basis of allegations in their complaint until 2016 and 2017. This is insufficient to delay accrual of their cause of action. "A plaintiff need not be aware of the specific 'facts' necessary to establish the claim; that is a process contemplated by pretrial discovery. Once the plaintiff has a suspicion of wrongdoing, and therefore an incentive to sue, she must decide whether to file suit or sit on her rights. So long as a suspicion exists, it is clear that the plaintiff must go find the facts; she cannot wait for the facts to find her." (*Jolly v. Eli Lilly & Co.*, *supra*, 44 Cal.3d at p. 1111.) "This is not a case in which the plaintiff 'possessed no factual basis for suspicion.' . . . The delayed discovery rule does not apply." (*WA Southwest 2, LLC v. First American Title Ins. Co.* (2015) 240 Cal.App.4th 148, 157 [ignoring private placement memorandum received prior to making an investment was not reasonable diligence].)

Plaintiffs also add without citation to the record that their discovery occurred "after [d]efendants repeatedly misrepresented the funding available for the [supplemental] benefit." We need not address this unsupported statement or arguments that were only raised or supported by citations to the record on reply. (*People v. Baniqued*, *supra*, 85 Cal.App.4th at p. 29; *Guthrey v. State of California*, *supra*, 63 Cal.App.4th at p. 1115.) Nonetheless, as we discuss in the context of plaintiffs' equitable estoppel argument, plaintiffs' assertions of misrepresentations do not alter our conclusions. The mere fact that class members and class counsel were told there had been insufficient funds does not change the fact the record shows class members and class counsel were still suspicious that defendants had breached the settlement agreement

16

and thus were charged with any knowledge they could have discovered. "[A] potential plaintiff who suspects that an injury has been wrongfully caused must conduct a reasonable investigation of *all* potential causes of that injury." (*Fox v. Ethicon Endo-Surgery, Inc.*, *supra*, 35 Cal.4th at p. 808, italics added; see also *ibid.* ["plaintiffs are required to conduct a reasonable investigation after becoming aware of an injury, and are charged with knowledge of the information that would have been revealed by such an investigation"].)

Plaintiffs contend Chiurazzi could not "waive" the rights of the class and the County has forfeited any claim that Chiurazzi and the Retired Employees Organization were agents of the class. The County moved for summary judgment based in part on the assertion that Chiurazzi and the Retired Employees Organization were arguing the settlement agreement had been breached in 2007 and could have conducted the same research then. Consistent with its role under CERL, the Retired Employees Organization has represented itself as a representative of all retirees. (E.g., § 31592.6 ["In order for a recognized retiree organization to fulfill its obligations to the retired members of the system and to communicate with them, upon the organization's request the board shall cooperate with and assist the organization in distributing communications"].) The County also submitted as an undisputed fact that the Retired Employees Organization repeated the relevant financial information in its own newsletter that was distributed to the County Retirement Association retirees including the named plaintiffs. It was plaintiffs' burden to create a triable issue of material fact that their claims survived based on a nonstatutory exception to the limitations period. (*Aryeh v. Canon Business Solutions, Inc.*, *supra*, 55 Cal.4th at p. 1197.) Chiurazzi submitted a declaration explaining that he has been handling legal matters for the San Joaquin County Deputy Sheriff's Association since about 1982 and filed the litigation underlying the settlement agreement on its behalf. In 2007, he assisted the County Retirement Association, "but was not an attorney for any individual retiree or member of the Class in this matter." We

17

note the job of class counsel does not always end with the entry of judgment. (*Barboza v. West Coast Digital GSM, Inc.* (2009) 179 Cal.App.4th 540, 547.) Further, the undisputed evidence shows that the supplemental benefit set forth in the settlement agreement was never fully funded. The named class representatives agreed to "remain and serve as a Class Representative of the Class, until the terms of the Settlement Agreement are effectuated." "A principal is deemed to have notice of whatever its agent has notice of and should reasonably communicate to the principal. . . . Included among the types of information that may be imputed from agent to principal are facts used to determine the date of accrual of a statute of limitations." (*Baxter v. State Teachers' Retirement System* (2017) 18 Cal.App.5th 340, 366-367.) Nonetheless, our conclusion there was no triable issue of material fact is not based on waiver or agency but plaintiffs' general failure to produce sufficient evidence to " 'allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof.' " (*King v. United Parcel Service, Inc.*, *supra*, 152 Cal.App.4th at p. 433.) Specifically, they have not cited evidence sufficient to create a triable issue of fact on the question of whether they were aware of facts that would make a reasonably prudent person suspicious. Because plaintiffs and their representatives chose not to pursue their inquiry further despite their suspicions, they are charged with knowledge of facts that would have been revealed if they had pursued the investigation. (*Miller v. Bechtel Corp.*, *supra*, 33 Cal.3d at p. 875.)

Plaintiffs have failed to establish that the trial court erred in concluding their claims were barred by the statute of limitations.

C.     *Equitable Estoppel*

Plaintiffs argue defendants are equitably estopped from asserting the statute of limitations based on their misleading statements and omissions.

"The doctrine of equitable estoppel is founded on notions of equity and fair dealing and provides that a person may not deny the existence of a state of facts if that

18

person has intentionally led others to believe a particular circumstance to be true and to rely upon such belief to their detriment. [Citation.] ' "Generally speaking, four elements must be present in order to apply the doctrine of equitable estoppel: (1) the party to be estopped must be apprised of the facts; (2) he must intend that his conduct shall be acted upon, or must so act that the party asserting the estoppel had a right to believe it was so intended; (3) the other party must be ignorant of the true state of facts; and (4) he must rely upon the conduct to his injury." ' [Citations.] Where, as here, a party seeks to invoke the doctrine of equitable estoppel against a governmental entity, an additional element applies. That is, the government may not be bound by an equitable estoppel in the same manner as a private party unless, 'in the considered view of a court of equity, the injustice which would result from a failure to uphold an estoppel is of sufficient dimension to justify any effect upon public interest or policy which would result from the raising of an estoppel.' " (*City of Oakland v. Oakland Police & Fire Retirement System* (2014) 224 Cal.App.4th 210, 239-240.) Plaintiffs failed to address this final element in their opening brief and before the trial court. Additionally, "[i]n order to prove the third essential [element], it is necessary that the evidence show not only that the party claiming the estoppel did not have actual knowledge of the true facts but that he did not have notice of facts sufficient to put a reasonably prudent man upon inquiry, the pursuit of which would have led to actual knowledge; the convenient or ready means of acquiring knowledge being the equivalent of knowledge." (*Banco Mercantil, S.A. v. Sauls, Inc.* (1956) 140 Cal.App.2d 316, 323.) Plaintiffs cite general statements in newsletters and letters dating back to the first suspension of benefits that there had been no excess earnings to continue to fund the supplemental benefit payments beyond the original $16.2 million. Though we need not address the merits of plaintiffs' substantive claims, the trial court did. And in so doing, the trial court determined there were no miscommunications to the class because "[p]laintiffs received accurate communications from [d]efendants based upon the advice and recommendations provided to them by their actuaries in

19

accordance with statutory and Constitutional requirements." Plaintiffs appear to concede that respondents' primary argument is that the settlement agreement incorporates an "actuarial prudence" standard. In other words, plaintiffs' assertion that defendants misled them depends on an ultimate conclusion their claims have merit. Regardless, the evidence demonstrated that, by 2007, plaintiffs had notice of facts sufficient to put a reasonably prudent person on inquiry.

Additionally, plaintiffs acknowledge that, in 2007, some retirees were aware from the 2006 Comprehensive Annual Financial Report that the contingency reserve account exceeded 1 percent of assets and were arguing that the excess should be used to fund the supplemental benefit payments. We note this report also listed the restricted UER that plaintiffs now claim should have been used to fund their supplemental payments. Plaintiffs argue these individuals were misled by false statements to Chiurazzi and the Retired Employees Organization from the County Retirement Association's Chief Executive Officer in 2007 that "[i]n December 2002, the unapportioned earnings reserves were insufficient to fully credit all reserves with interest at 8%. The [contingency reserve] was drawn down to zero and remained so until December 2006 when it was reestablished at . . . 1.119% of the fund." Nonetheless, after receiving these statements, Chiurazzi still opined that maintaining a contingency reserve above 1 percent breached the agreement. His opinion referred to the 2006 Comprehensive Annual Financial Report as well as this representation. Moreover, even after payments resumed, the issue of the contingency reserve was raised again at an October 2008 Board meeting in which an attorney for the Retired Employees Organization "added that the retirees were prepared to take legal action to require the Board to draw[] down to the [1] percent." Thus, we cannot conclude these statements create a triable issue of fact as to whether any plaintiff had notice of facts sufficient to put a reasonably prudent person upon inquiry. Plaintiffs have failed to establish the trial court erred in rejecting their assertion that defendants should be equitably estopped from asserting the statute of limitations.

20

Therefore, plaintiffs have not established the trial court erred in granting respondents' motions for summary judgment.

### III.  DISPOSITION

The judgment is affirmed.  Respondents shall recover their costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(1) & (2).)


/S/

_____

RENNER, J.


We concur:

/S/

_____

BLEASE, Acting P. J.


/S/

_____

KRAUSE, J.