Filed 12/14/23  Jones v. Telecare Corp. CA2/3

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| EDWIN JONES, as Successor in Interest, etc., | B314977 |
| Plaintiff and Appellant, | Los Angeles County Super. Ct. No. 19STCV06933 |
| v. | |
| TELECARE CORPORATION et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Daniel S. Murphy, Judge.  Affirmed.

Shegerian & Associates, Carney R. Shegerian, Mahru Madjidi and Rosie Zilifyan for Plaintiff and Appellant.

Seyfarth Shaw, Dana L. Peterson, Kiran A. Seldon, Shardé T. Skahan, Catherine M. Dacre and Giovanna A. Ferrari for Defendants and Respondents Telecare Corporation and Cherie Harper.

Cabada & Hameed, Francisco Cabada, Sayema Hameed; Pacific Employment Law and Joseph P. Mascovich for Defendant and Respondent Michael Meyer.

---

Rebecca Jones sued her former employer Telecare Corporation for disability discrimination and related claims under the Fair Employment and Housing Act, Government Code section 12900 et seq. (FEHA).[1]  The trial court entered summary judgment for Telecare, concluding the undisputed evidence proved the company terminated Jones's employment for a legitimate reason and Jones did not request an accommodation triggering Telecare's related legal obligations under FEHA. We affirm.

---

[1]     Statutory references are to the Government Code, unless otherwise designated.

Jones also sued her individual supervisors Cherie Harper and Michael Meyer.  Although her notice of appeal purports to challenge the entire judgment, Jones confirms in her reply brief that she does not seek reversal of the judgment in favor of the individual defendants.  Jones also does not challenge the summary adjudication of her claims for harassment and hostile work environment; discrimination on the basis of age; failure to pay wages, waiting time penalties, and civil penalties; failure to provide meal and rest breaks; and unfair business practices. Her briefs make no arguments with respect to her claim under the California Family Rights Act, and we therefore deem any challenge to the summary adjudication of that claim waived. (See *Benach v. County of Los Angeles* (2007) 149 Cal.App.4th 836, 852.)

Jones passed away after she filed this appeal.  We subsequently granted her surviving spouse's request for

## BACKGROUND

Consistent with our standard of review, we state the facts in the light most favorable to Jones as the nonmoving party, resolving all evidentiary doubts or ambiguities in her favor. (*Avila v. Continental Airlines, Inc.* (2008) 165 Cal.App.4th 1237, 1243, fn. 2 (*Avila*).)

Telecare provides inpatient services to mentally ill residents. In June 2005, Telecare hired Jones as a social worker at its La Paz Geriopsychiatric Center in Paramount, California. Her duties included conducting assessments of residents, teaching social and behavior skills, and preparing documentation on the residents according to Telecare's policies with the goal of preparing the residents to transfer out of the facility.

Cherie Harper was Jones's supervisor and the clinical director at La Paz. Michael Meyer was Harper's supervisor and the administrator of the La Paz facility.

In December 2017, Jones was diagnosed with breast cancer. A few days later, she notified Harper of the diagnosis and that she would need to take medical leave for surgery.

Before Jones began her leave, Harper coached her about "the lack of timeliness of her documentation." In a January 5, 2018 email, Harper agreed to "assist [Jones] with catching up with [her] monthly notes," by "complet[ing] 16 notes" for some of Jones's assigned residents.

Jones took her first medical leave from January 15, 2018 to March 12, 2018. During her leave, Jones "noticed necessary paperwork . . . was not completed even though Ms. Harper said

appointment as her successor in interest. For brevity, we attribute the appellant's arguments to Jones.

she would complete it." Because she "did not want to get in trouble or counseled for falling behind," Jones "worked two to three days a week for approximately three to four hours at a time" during her disability leave. Although Jones maintained Harper and Meyer "could see" she was working from home if they had looked at the completed reports, she also admitted neither supervisor asked her to work while on medical leave and she did not record her time or otherwise notify Telecare management she was performing the work.

Shortly after Jones returned from medical leave, Meyer "verbally counseled" her for being behind on her paperwork. Jones also observed that Harper began avoiding or "nitpicking" her, and Harper made comments suggesting she "was very agitated with having to do [Jones's] workload while [Jones] was out on disability." Jones told Harper she "had too much work and was under a lot of stress because of [her] medical condition," but the only limitation she disclosed to her supervisor was that her "doctor said [she] could not lift more than five pounds." Other than this, Jones acknowledged her doctor released her to return to work without restrictions.

In April 2018, Jones notified Harper that she needed to take a second medical leave for reconstructive surgery. She observed Harper became "even colder" after this. Harper "stopped coming to supervise" Jones and she no longer "check[ed] in" to "see how things were going."

Before Jones took her second medical leave, she met with Meyer and Harper to complete her annual performance review. She received ratings of "Below Expectations" in two out of nine categories ("Quality and Quantity of Work" and "Management, Decision Making and Initiative"). She received "Meets

4

Expectations" ratings in all other categories, and an overall rating of "Meets Expectations" with a corresponding salary increase. Harper's comments noted Jones was "at least 4 months behind with turning in her monthly progress notes" and that a "number of the residents on [Jones's] caseload made several complaints that [Jones] would not see them regularly or consistently." Jones objected to the lower ratings, writing that "[s]udden [and] drastic changes within the facility as well as a large increase in paper work, change of office, increased [discharge] [and] admissions also affected relationship with resident case load." She also said she had been working "extra time to do my best to improve my performance again through med. issues."

Jones took her second medical leave from May 22, 2018 to June 23, 2018. A week after she returned to work, Meyer and Harper reprimanded Jones for "dumping" her work on coworkers. Jones "felt that [she] was being targeted because this was not true."

In early August 2018, Jones informed Harper that she needed to take a third leave for a surgery scheduled on September 18, 2018. Jones did not provide a doctor's note to Telecare's human resources department regarding the scheduled surgery.

On August 29, 2018, Jones had a confrontation with a resident who suffered from schizophrenia and other mental health conditions. The resident told Jones "to get out of his space," called her " 'white cracker cunt bitch,' " and said he would "beat [her] up and 'rip off' [her] face if [Jones] did not get out of his sight." He also told Jones he "hated" her, he "wanted to hurt" her, and he planned to " 'mess with her every time' " he saw her.

5

On several other occasions he had told Jones "he wanted to get [her] fired." According to Jones, "[t]his was nothing new," as the residents at La Paz regularly yelled or called the staff names.

After speaking with the resident's social worker, Jones reviewed his "care plan," which suggested that staff "intervene before his agitation escalates by engaging 'calmly in conversation.' " The care plan also instructed that, "if he becomes aggressive[,] the staff is to walk away and approach later." Jones was "aware" of the resident's propensity for "verbal aggression" and "loud outbursts." She also knew he could become "argumentative when verbal intervention was provided."

Later the same day, the resident again accosted Jones with racial and sexist slurs. According to Jones, she decided to intervene and "leaned over to calmly ask him why he was saying those things about [her]." The resident immediately started "screaming, yelling, [and] threatening" Jones while accusing her of calling him the " 'n-word.' " Another staff member, Gloria Ruffin, put her arm around Jones so they "could walk away together." As they walked away, Jones says she "raise[d] [her] voice" to tell the staff what had happened.

At the direction of Telecare's human resources department, Ruffin prepared a written statement describing what she had witnessed. She saw Jones exit an elevator near the facility's lobby that afternoon, and the resident "immediately" began "verbally attack[ing]" Jones. Jones then "turned and walked back towards" the resident, bent to the resident's ear, and said "something back to him," sparking a "verbal altercation."[2] Ruffin

_____

[2] The resident's social worker interviewed him in connection with the incident. According to the resident, Jones "came up and called him a 'Black fucker.' "

6

said she "immediately intervened" by "pulling [Jones] away" as the resident's behavior "continue[d] to escalate" with physical threats and abusive racially charged language. Jones also exhibited "escalate[d] behavior," and continued to ask the resident " 'why are you taunting me,' " and " '[w]hy do you keep messing with me,' " while telling him " '[y]ou will not keep disrespecting me.' " Ruffin was forced to intervene a "second time" to separate Jones from the resident.

After learning of the incident, Harper and Meyer interviewed Jones, Ruffin, and another eyewitness—Rosa Elizarraraz. Jones told Harper the resident had accosted her earlier in the day " 'calling me bitches' " and she " 'did not say anything to him at that time.' " But when he confronted her later that day, Jones said she had " 'had enough' " and she " 'did engage in a verbal exchange with the resident because [he] called me a "white cracker bitch." ' " She explained that the resident had " 'been targeting me for a couple weeks now calling me all kinds of bad names' " and she had " 'had enough of him harassing' " her. When Harper asked Jones why she did not disengage after "Ruffin intervened and instructed her to move away from the resident," Jones responded, " 'because he kept on talking to me and calling me names and I wanted him to stop and I wanted to know why does he keep bothering me.' " Jones denied that she used profanity or a racial slur, explaining, " 'All I was saying to him was why do you keep bothering me, and enough is enough he should leave me alone.' " When Meyer asked Jones if she had been trained "not to incite or provoke" residents and to "utilize de-escalation techniques or remove yourself from danger," Jones acknowledged her training but said, " 'in this situation I just really wanted to know why this

7

resident has it in for me.' " Harper and Meyer informed Jones that she was on administrative leave until their investigation concluded.

In her interview, Ruffin elaborated on her written statement, explaining that Jones " 'continued yelling at the resident,' " " '[s]he just kept coming towards the resident and getting very close to him,' " and " '[s]he just would not walk away.' " Elizarraraz likewise reported that Ruffin told Jones " 'to move away from the resident, but [Jones] continued coming towards the resident[,] yelling and getting in the resident['s] face . . . in an intimidating way,' " while " 'yelling at him[,] "[w]hy do you always bother me" [and] "what's your problem with me." ' "

Based on the investigation, Harper concluded Jones had "engaged in an inappropriate heated altercation with a resident." She reported: "Multiple witness[es] observed [Jones] engaged in a verbal altercation with the resident and when staff tried to re-direct [Jones] she would not dis-engage from the interactions. [Jones] was observed physically close to [the] resident, using a raised voice talking in the resident['s] face. Multiple witness[es] observed [Jones] whisper something in the resident's ear, which cause[d] [the] resident to react in a loud voice." Harper recommended Jones's termination. Telecare's human resources department ultimately approved the recommendation based on the investigation's findings.

On September 5, 2018, Telecare issued Jones a notice of discharge. Citing Telecare's policies prohibiting "[d]isrespectful, discourteous, or demeaning conduct towards residents," the notice stated: "An investigation determined that you got into an inappropriate verbal altercation with a resident in which you were witnessed yelling in the resident's face. A coworker

8

tried to get you to stop and move away from the resident. Despite your coworker's efforts you continued to yell and argue with the resident. This is unacceptable."

On February 28, 2019, Jones filed this action against Telecare. Her operative first amended complaint asserts claims for disability discrimination; retaliation; failure to prevent discrimination and retaliation; wrongful discharge in violation of public policy; failure to engage in a good faith interactive process; and failure to provide reasonable accommodation.[3]

Telecare moved for summary judgment, submitting a supporting declaration by Harper; deposition testimony from Jones; and other documentary evidence. In addition to challenging Jones's prima facie case, Telecare argued it had a legitimate nondiscriminatory and nonretaliatory reason for her discharge—namely, that it genuinely determined based on the results of its investigation that Jones had engaged in gross misconduct by persisting in an abusive verbal altercation with a mentally ill resident even after her coworker attempted to pull her away from the confrontation. As for the disability accommodation and interactive process claims, Telecare maintained Jones could not prove liability because the undisputed evidence established it granted all of Jones's requests for leave; Jones returned to work without restrictions; and Jones did not submit documentation to Telecare about her need for additional leave before her termination.

---

[3]     As noted, Jones asserted other claims against Telecare, Harper, and Meyer that are not at issue in this appeal. (See fn. 1, *ante*.)

In opposition, Jones principally relied upon her own declaration and deposition excerpts; excerpts from Harper's and Meyer's depositions; and other documentary evidence. She also submitted declarations from Linda Kimborough and Jacqueline Lambert—two former employees of Telecare who had worked with Jones and vouched for her character. Neither witnessed Jones's altercation with the resident.

Jones argued her negative performance review and her supervisors' needless faultfinding concerning her paperwork after she returned from medical leave, coupled with Harper's comments about picking up her workload and the timing of her discharge only about two weeks before her third scheduled surgery, established the causal connection element of her prima facie case for disability discrimination and retaliation. As for pretext, in addition to the evidence supporting her prima facie case, Jones argued other evidence demonstrating her supervisors did not thoroughly investigate the incident and that they had given shifting reasons for her discharge supported an inference that Telecare's true motives were discriminatory and/or retaliatory. Finally, Jones argued evidence that Telecare terminated her shortly after she notified Harper that she would need to take a third medical leave proved Telecare did not engage in a good faith interactive process and failed to accommodate her known disability.

The trial court granted Telecare's summary judgment motion. The court concluded Jones had presented no admissible evidence of discriminatory animus or retaliation to satisfy her prima facie burden and she likewise failed to submit "specific and substantial" evidence of pretext in response to Telecare's showing that it discharged her for a legitimate reason. As for

10

the interactive process and disability accommodation claims, the court concluded undisputed evidence that Telecare granted each of Jones's leave requests before her termination irrefutably proved "Telecare fulfilled its duty to engage in the interactive process and provided [Jones] with all of her requested accommodations."

The trial court entered judgment in favor of Telecare on all claims. After an unsuccessful motion for new trial, Jones filed a timely notice of appeal.

## DISCUSSION

### 1. *Standard of Review*

A defendant moving for summary judgment must show the plaintiff cannot establish one or more elements of the cause of action or cannot refute an affirmative defense. (Code Civ. Proc., § 437c, subd. (o).) "From commencement to conclusion, the moving party bears the burden of persuasion that there is no genuine issue of material fact and that he is entitled to judgment as a matter of law. There is a genuine issue of material fact if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 845, fn. omitted; see *Slovensky v. Friedman* (2006) 142 Cal.App.4th 1518, 1522.)

We review the record and trial court's determination de novo. (*Merrill v. Navegar, Inc.* (2001) 26 Cal.4th 465, 476.) First, we identify the issues raised by the pleadings, as these are the allegations to which the motion must respond. Second, we determine whether the moving party's showing has established facts negating the opponent's claims and justifying

11

a judgment in the moving party's favor.  When this showing is made, the final step is to determine whether the opposition demonstrates the existence of a triable issue of material fact. (*Barclay v. Jesse M. Lange Distributor, Inc.* (2005) 129 Cal.App.4th 281, 290.)  In conducting this analysis, we strictly construe the moving party's evidence, while liberally construing the evidence offered in opposition, and we accept as undisputed facts only those parts of the moving party's evidence that are not contradicted by the evidence of the opposing party.  (*Arteaga v. Brink's, Inc.* (2008) 163 Cal.App.4th 327, 342 (*Arteaga*).)

When an employee asserts a claim for employment discrimination or retaliation, she must first establish a prima facie case that she suffered an adverse employment action due to an unlawful motivation.  The employer can then rebut the employee's claim by offering substantial evidence of a legitimate, nondiscriminatory reason for its employment decision.  " ' "If the employer presents admissible evidence either that one or more of plaintiff's prima facie elements is lacking, or that the adverse employment action was based on legitimate, nondiscriminatory factors, the employer will be entitled to summary judgment *unless the plaintiff produces admissible evidence which raises a triable issue of fact material to the defendant's showing."* ' "  (*Arteaga, supra,* 163 Cal.App.4th at p. 344; *Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 356–357 (*Guz*); *Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1042 (*Yanowitz*).)  To resist summary judgment, the employee's evidence must demonstrate the existence of a material controversy *as to pretext or unlawful animus* on the part of the employer.  (*Arteaga,* at p. 344.)  It is not enough to make a bare prima facie showing or to simply deny the credibility

12

of the employer's witnesses or to speculate as to discriminatory motive. (*Guz,* at pp. 360–361; *Hersant v. Department of Social Services* (1997) 57 Cal.App.4th 997, 1004–1005 (*Hersant*); *Arteaga,* at p. 343.)

Moreover, the employee cannot prevail by simply showing the employer's decision was wrong or mistaken, as the factual dispute is over whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent. (*Hersant, supra,* 57 Cal.App.4th at p. 1005.) Instead, the employee must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its actions that a trier of fact could legitimately find them " ' "unworthy of credence" ' " and infer that the employer did not act for the asserted nondiscriminatory reason—that is, the employee must show the employer's proffered reason is pretextual. (*Ibid.*; *Arteaga, supra,* 163 Cal.App.4th at pp. 342–343.) The ultimate issue is whether the employer acted with a motive to discriminate or retaliate. (*Guz, supra,* 24 Cal.4th at p. 358.) On summary judgment, the question is whether a triable issue of fact exists as to the employer's motivations.

2. ***FEHA Disability Discrimination and Retaliation Claims: Jones Failed to Offer Substantial Evidence of Illegitimate Animus or Pretext***

" 'A prima facie case for discrimination "on grounds of physical disability under the FEHA requires plaintiff to show: (1) he suffers from a disability; (2) he is otherwise qualified to do his job; and, (3) he was subjected to adverse employment action because of his disability." ' " (*Arteaga, supra,* 163 Cal.App.4th at pp. 344–345.) Similarly, to establish a prima facie case of

13

retaliation under the FEHA, a plaintiff must show "(1) he or she engaged in a 'protected activity,' (2) the employer subjected the employee to an adverse employment action, and (3) a causal link existed between the protected activity and the employer's action." (*Yanowitz, supra,* 36 Cal.4th at p. 1042.)  Under either theory, " 'the plaintiff must produce evidence sufficient to show that an illegitimate criterion was a *substantial factor* in the particular employment decision.' " (*Harris v. City of Santa Monica* (2013) 56 Cal.4th 203, 232.)

In summarily adjudicating the disability discrimination and retaliation claims in Telecare's favor, the trial court concluded Jones lacked sufficient evidence to show an illegitimate criterion motivated the company's discharge decision and, in any event, Telecare had offered credible and uncontroverted evidence that it fired Jones for a nondiscriminatory and nonretaliatory reason.  We need not address the former ground, because we conclude the latter one supports the court's ruling. (See, e.g., *Guz, supra,* 24 Cal.4th at p. 357 [the reviewing court "need not resolve the 'prima facie burden' issue" where the employer moving for summary judgment sets forth "competent, admissible evidence" of its legitimate reasons for an adverse employment action].)

The employer's proffered reason is "legally sufficient to establish [an employee's] FEHA cause of action ha[s] no merit" if it is "manifestly unrelated" to intentional discrimination or retaliation against the employee.  (*Guz, supra,* 24 Cal.4th at p. 360.)  "While the objective soundness of an employer's proffered reasons supports their credibility . . . , the ultimate issue is simply whether the employer acted with *a motive to discriminate illegally*." (*Id.* at p. 358.)  Thus, "if

nondiscriminatory, [the employer's] true reasons need not necessarily have been wise or correct." (*Ibid.*) "[A]n employer is entitled to summary judgment if, considering the employer's innocent explanation for its actions, the evidence as a whole is insufficient to permit a rational inference that the employer's actual motive was discriminatory." (*Id.* at p. 361.)

Telecare presented competent and admissible evidence demonstrating it terminated Jones's employment for a nondiscriminatory and nonretaliatory reason. As stated in the company's notice of discharge to Jones, "[a]n investigation determined that [Jones] got into an inappropriate verbal altercation with a resident in which [Jones] [was] witnessed yelling in the resident's face" in violation of company policies prohibiting "[d]isrespectful, discourteous, or demeaning conduct towards residents." One of the witnesses, Gloria Ruffin, recounted seeing Jones get " 'really close to the resident's face and [a] verbal exchange escalated.' " Ruffin said she tried " 'to pull and re-direct [Jones] away from the resident,' " but " '[Jones] continued yelling at the resident asking the resident why was he bothering her and why was he targeting her.' " Ruffin said she " 'ask[ed] [Jones] to just walk away and not talk back to the resident but [Jones] would not listen' "; " '[Jones] just kept coming towards the resident and getting very close to him' "; and " '[Jones] just would not walk away.' " Consistent with Ruffin's account, the other witness, Rosa Elizarraraz, reported that " '[Ruffin] was telling [Jones] to move away from the resident, but [Jones] continued coming towards the resident[,] yelling and getting in the resident['s] face . . . in an intimidating way[,] yelling at him[,] "[w]hy do you always bother me" [and] "what's your problem with me." ' " In her interview, Jones herself

15

confirmed that she continued to engage in a verbal exchange with the resident instead of walking away " 'because I [Jones] am tired of him calling me all kinds of names and threatening me. . . . I just wanted to know from him why he keeps messing with me.' "

As stated in her supporting declaration, La Paz's clinical director, Cherie Harper, concluded "Jones engaged in and escalated an inappropriate heated altercation with a resident," which Harper believed "constituted, at a minimum, a violation of Telecare's workplace policies." Harper recommended Jones's termination, and the evidence shows Telecare's human resources department ultimately approved the recommendation based on the investigation's findings. In the face of Telecare's showing of a legitimate reason for her discharge, the burden shifted to Jones to respond with substantial evidence putting the company's motive "in material dispute by raising a triable issue, i.e., a permissible inference, that, in fact, [Telecare] acted for discriminatory purposes." (*Guz, supra,* 24 Cal.4th at p. 362; *Arteaga, supra,* 163 Cal.App.4th at p. 353.)

Jones contends she presented sufficient evidence to prove Telecare's stated reason was a "false" pretext to cover up its true illegitimate motive for discharging her. As our Supreme Court explained in *Guz,* "an inference of intentional discrimination *cannot* be drawn *solely* from evidence, if any, that the company *lied* about its reasons"; however, "[p]roof that the employer's proffered reasons are unworthy of credence may 'considerably assist' a circumstantial case of discrimination, because it suggests the employer had cause to hide its true reasons." (*Guz, supra,* 24 Cal.4th at pp. 360–361, italics added.) "Still, there must be evidence supporting a rational inference that

16

*intentional discrimination, on grounds prohibited by [FEHA], was the true cause* of the employer's actions." (*Id.* at p. 361.) "[S]ummary judgment for the employer may thus be appropriate where, given the strength of the employer's showing of innocent reasons, any countervailing circumstantial evidence of discriminatory motive, even if it may technically constitute a prima facie case, is too weak to raise a rational inference that discrimination occurred." (*Id.* at p. 362.)

The record contains no direct evidence, and little if any relevant circumstantial support, for Jones's contention that Telecare misrepresented its true reason for terminating her employment. Citing her declaration, Jones asserts Telecare's investigation was flawed in that "her version of events was not recorded, witnesses that would have testified to her credibility and character were not interviewed, and the investigation only lasted for one day and was not thorough." As to the first point, Jones's declaration merely states she "told [the interviewers] all the names [the resident] was calling me, including all the racial names," but it provides no other details about events that supposedly were not recorded. The omission hardly casts doubt on Telecare's motives, especially given that Jones's declaration (like her interview) *confirmed* the critical fact that she "engaged with the resident rather than ignoring him" because she "wanted to find out why he felt so nasty towards me and wanted him to calm down and stop calling me names." Harper, who interviewed Jones, recorded this fact in the investigation documentation; the fact substantiated Ruffin's and Elizarraraz's accounts of Jones's refusal to disengage when a verbal altercation with the resident escalated; and the admission is consistent with Telecare's stated

17

reason for Jones's discharge—namely, that despite a "coworker's efforts[,] [Jones] continued to yell and argue with the resident."

Because Jones did not substantively dispute the other witnesses' accounts, Telecare had no reason to investigate her credibility, and no rational inference of pretext can be drawn from the company's decision not to interview her proposed character witnesses. The fact that the investigation lasted only one day is likewise irrelevant. Telecare interviewed Jones and two other eyewitnesses. Their accounts were largely consistent with respect to the material details and supported the finding that Jones persisted in a verbal altercation with a mentally ill resident while Ruffin tried to pull her away. Apart from interviewing irrelevant character witnesses and the patient's social worker (who did not witness the incident and at most would have confirmed the resident's mental illness and past abusive behavior), Jones does not identify what more Telecare should have done with a longer investigation. None of this raises a rational inference of illicit motive or pretext. (See, e.g., *Guz, supra,* 24 Cal.4th at p. 365 ["neither any failure by [the employer] to conduct the reorganization with full formality, nor [the decisionmaker's] lack of complete information about [the employee's] background and availability, strongly suggests that the reasons [the employer] gave for releasing [the employee] are false"].)[4]

_____

[4] In opposing summary judgment, Jones argued she followed the resident's treatment plan in confronting him about his abusive behavior. Even if that was true, it was insufficient to raise an inference of pretext. As discussed, an employee cannot resist summary judgment simply by showing "the employer's decision was wrong or mistaken, since the factual

18

Jones's other attempts to cast doubt on Telecare's investigation fare no better. She contends Harper "solely relied" on the resident's account of the altercation, "despite the fact that the patient had a reputation for caus[ing] havoc, making racist comments, and harassing Jones herself with no provocation." Similarly, she maintains Meyer's decision to recommend her termination was based entirely on the resident's unsubstantiated allegation that she used a racial slur. The summary judgment evidence supports neither assertion.

When asked at her deposition whether she believed the resident's accusations, Harper testified it was "not for me to believe or not," as Jones's alleged use of a racial slur "[was] not why [Jones] was fired."[5] Rather, consistent with Telecare's notice

dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." (*Hersant, supra,* 57 Cal.App.4th at p. 1005.) In view of the eyewitness accounts that Jones persisted in a verbal altercation with the resident, the prospect that the resident's social worker would have confirmed Jones's understanding of the care plan does not create a controverted issue of fact. (See, e.g., *King v. United Parcel Service, Inc.* (2007) 152 Cal.App.4th 426, 435–436 (*King*) [evidence suggesting co-worker may have made false statements about plaintiff were irrelevant to establishing pretext; "[i]t is the employer's honest belief in the stated reasons for firing an employee and not the objective truth or falsity of the underlying facts that is at issue in a discrimination case"].)

[5]  Harper also clarified that the resident's conduct had essentially no impact on her recommendation, as she understood the residents were "mentally ill people and they say things all the time. They have delusions. They hear voices. So that kind of stuff, it kind of comes with the territory."

of discharge, Harper confirmed Jones was terminated for "[t]he yelling and the screaming" she directed at the resident, which constituted "verbal abuse" under Telecare's policies. As for Meyer, although he initially said Jones would not have been discharged if she had not used a racial slur, he later clarified that the incident happened "too long" ago to recall the circumstances surrounding the allegation and, in any event, regardless of whether Jones used the slur, the fact that she continued to yell at a mentally ill resident alone constituted "abuse" and grounds for discharge.[6] Meyer's recanted deposition testimony, stemming from his foggy recollection of an incident that happened almost three years earlier, is insufficient to raise a triable issue in the face of Telecare's compelling contemporaneous evidence that it discharged Jones for a reason unrelated to her disability or protected activity. (See, e.g., *Guz, supra,* 24 Cal.4th at p. 364 [evidence that a company official "once used the phrase 'downturn in . . . workload,' " or that "cost efficiencies of eliminating [the employee's division] [were] debatable on their merits," insufficient to raise triable issue of pretext based on purported " 'shifting,' and 'inconsistent' statements" of employer's management].)

Apart from her objections to Telecare's investigation, Jones contends the temporal proximity between her medical leaves and a purported "pattern of consistent retaliatory conduct" supports an inference of prohibited bias. Jones emphasizes she received largely positive performance reviews throughout her tenure at

---

[6]     Meyer also testified that he "totally agree[d]" with Harper's account that Jones was not terminated for using a racial slur, but rather because she "engaged in a verbal altercation that resulted in an escalation of a situation with an upset resident."

Telecare and maintains it was only after she returned from her medical leave that her "performance reviews began to suddenly contradict an otherwise commendable record of employment." She says her "first medical leave was met by a cold shoulder, lack of communication, more work, and negative performance reviews" from Harper, all of which "only worsened upon [her] return from her second leave." In a similar vein, she argues the timing of her discharge—"48 hours after the incident, and only 18 days before her third scheduled surgery"—suggests Telecare acted with an illicit purpose.

It is settled that "temporal proximity alone is not sufficient to raise a triable issue as to pretext once the employer has offered evidence of a legitimate, nondiscriminatory reason for the termination." (*Arteaga, supra,* 163 Cal.App.4th at p. 353.) " 'Employers are sometimes forced to remove employees who are performing poorly, engaging in improper work conduct, or severely disrupting the workplace. . . . Precedent does not prevent [an employer] from removing such an employee simply because the employee [recently] engaged in a protected work activity.' " (*Id.* at p. 354.) Nevertheless, "temporal proximity, *together* with the *other evidence*, may be sufficient to establish pretext," if the evidence as a whole demonstrates there is a disputed fact as to the reason for the adverse employment action. (*Id.* at pp. 353–354; see *Guz, supra,* 24 Cal.4th at p. 361.) The evidence here does not create a triable controversy on this decisive issue.

The "retaliatory conduct" Jones cites as evidence of pretext concerns counseling and a performance review she received regarding a four-month backlog on her patient documentation and complaints by a number of the residents about her lack of

21

regular and consistent contact with them. Although Jones objected to these negative ratings at the time, she did not dispute the existence of the backlog or the residents' reports, nor did she attribute the ratings to discriminatory or retaliatory animus. Instead, she asserted the deviation from her "over a decade" of "exemplary" resident interactions and "timely" documentation was due to "drastic changes within the facility as well as a large increase in paper work, [a] change of office, [and] increased [discharge] [and] admissions," all of which "affected relationship[s] with resident[s] [and] case load." More importantly, these negative ratings did not affect Jones's employment—she received an overall rating of "Meets Expectations" on the performance review as well as a corresponding salary increase, and, critically, Telecare did not invoke these minor performance issues as the reason for her termination. Rather, as stated in its notice of discharge, the company fired Jones because its investigation determined she engaged in an inappropriate verbal altercation with a resident in violation of Telecare's policies. Notwithstanding the temporal proximity to her medical leave and her past exemplary work performance, evidence that Jones received a handful of negative ratings *unrelated* to the company's demonstrated reason for her discharge does not raise a reasonable inference of pretext. (Cf. *Arteaga, supra,* 163 Cal.App.4th at pp. 353–354 [temporal proximity may be relevant to pretext where employee has excellent performance record, and then, after engaging in protected activity, is suddenly accused of serious performance problems, subjected to derogatory comments, and terminated for supposed performance issues]; see also *King, supra,* 152 Cal.App.4th at pp. 433–434 ["plaintiff's evidence must relate

22

to the motivation of the decision makers to prove, by nonspeculative evidence, an actual causal link between prohibited motivation and termination"].)

Jones likewise fails to demonstrate that her supervisor's "cold shoulder" or "lack of communication" had any bearing on Harper's response to the incident that precipitated Jones's discharge. Indeed, Jones's own contemporaneous evidence suggests she did not believe Harper was motivated by unlawful antipathy. On the contrary, in an email directed to Telecare's CEO in the days after her suspension, Jones wrote it was Harper's need "to illustrate advocacy for the resident," because their "program [was] currently under survey," that explained why the "clinical director [Harper] handled [the] incident in this way"—not any supposed resentment about Jones taking medical leave.[7]

Moreover, while Jones attributed Harper's response to the ongoing survey at the time, at her deposition she acknowledged that "yelling" and "intimidating behavior" directed at a resident

---

[7] In relevant part, Jones wrote to Telecare's CEO: "I am so stunned and upset about an incident at work . . . and the manner in which I was treated. I am currently under investigation and put on administrative leave without pay until some time next week when they decide if they will terminate me. It was an incident of the type that happens often with others too but usually works itself out, so I don't understand how the tables turned and it suddenly became such a bad thing that I caused. . . . Our program is currently under survey *which is why I think my clinical director handled this incident in this way*, to illustrate advocacy for the resident. But what the clinical director and administrator did was not right and was not fair." (Italics added.)

23

would be considered "abuse" and "grounds for termination" from Telecare. The fact that this incident occurred only 18 days before her third scheduled surgery does not create a reasonable inference of pretext. (See, e.g., *King, supra,* 152 Cal.App.4th at p. 436 ["mere fact that [employer] found plaintiff had breached its integrity policy shortly after returning to work is insufficient to raise an inference that his blood disorder prompted his discharge"; "a disabled employee has no greater prerogative to compromise his integrity than any other employee"]; accord, *Arteaga, supra,* 163 Cal.App.4th at p. 354 [" 'Employers are sometimes forced to remove employees who are . . . engaging in improper work conduct' " and the law " 'does not prevent [an employer] from removing such an employee simply because the employee [recently] engaged in a protected work activity.' "].)

Finally, Jones's insinuation that Telecare had a "corporate culture" of animus is insufficient to put the company's motives in material dispute. Jones makes much of Meyer's response to a deposition question about whether he agreed "the corporate culture at Telecare is such that if they want to get rid of an employee, they will find an excuse to do so." But Meyer merely affirmed that he thought the hypothetical might be true on "some occasions," while, with respect to Jones's discharge, he confirmed he "totally agreed" with Harper's assessment that the eyewitnesses' accounts of Jones's conduct "constituted grounds for termination because it was akin to verbal abuse of a resident."

All told, Jones presented evidence of, at most, suspicious timing and minor slights that, *if left unexplained*, might have supported a claim for unlawful discrimination or retaliation. However, in the face of Telecare's strong showing of a lawful reason for her discharge, this largely irrelevant circumstantial

24

evidence was "too weak to raise a rational inference that discrimination occurred." (*Guz, supra,* 24 Cal.4th at p. 362.)

**3.** ***The Failure to Prevent Discrimination and Wrongful Termination Claims: Telecare's Legitimate Discharge Decision Precludes Liability on the Derivative Claims***

Having concluded Telecare was entitled to summary judgment of Jones's disability discrimination and retaliation claims, we necessarily reach the same conclusion with respect to Jones's " 'derivative' claims" for failure to prevent discrimination or retaliation and wrongful termination in violation of public policy. (*Lin v. Kaiser Foundation Hospitals* (2023) 88 Cal.App.5th 712, 727–728.) We affirm the summary adjudication of these claims as well.

**4.** ***The Failure to Accommodate and Interactive Process Claims: Jones Did Not Disclose a Relevant Limitation or Request an Accommodation Necessitating an Interactive Process***

"In addition to a general prohibition against unlawful employment discrimination based on disability, FEHA provides an independent cause of action for an employer's failure to provide a reasonable accommodation for an . . . employee's known disability." (*Gelfo v. Lockheed Martin Corp.* (2006) 140 Cal.App.4th 34, 54 (*Gelfo*), citing § 12940, subds. (a), (m).)[8] " 'Under the express provisions of the FEHA, the employer's failure to reasonably accommodate a disabled individual is

---

[8] Section 12940, subdivision (m)(1) makes it an unlawful employment practice for an employer "to fail to make reasonable accommodation for the known physical or mental disability of an applicant or employee."

a violation of the statute in and of itself.' [Citations.] Similar reasoning applies to violations of [FEHA] for an employer's failure to engage in a good faith interactive process to determine an effective accommodation, once one is requested." (*Gelfo,* at p. 54, citing § 12940, subd. (n).)[9]

"Two principles underlie a cause of action for failure to provide a reasonable accommodation. First, the employee must request an accommodation. [Citation.] Second, the parties must engage in an interactive process regarding the requested accommodation and, if the process fails, responsibility for the failure rests with the party who failed to participate in good faith. [Citation.] While a claim of failure to accommodate is independent of a cause of action for failure to engage in an interactive dialogue, each necessarily implicates the other." (*Gelfo, supra,* 140 Cal.App.4th at p. 54.)

"The employee bears the burden of giving the employer notice of his or her disability. [Citation.] Although no particular form of request is required [citation], ' "[t]he duty of an employer reasonably to accommodate an employee's handicap does not arise until the employer is 'aware of [the employee's] disability *and physical limitations*.' [Citations.]" ' " (*Avila, supra,* 165 Cal.App.4th at pp. 1252–1253, italics added.) " '[I]t is important to distinguish between an employer's knowledge of an employee's disability versus an employer's knowledge of any limitations

---

9    Section 12940, subdivision (n) makes it an unlawful employment practice for an employer "to fail to engage in a timely, good faith, interactive process with the employee or applicant to determine effective reasonable accommodations, if any, in response to a request for reasonable accommodation by an employee or applicant with a known physical or mental disability or known medical condition."

26

experienced by the employee as a result of the disability. This distinction is important because the [applicable law] requires employers to reasonably accommodate limitations, not disabilities.' " (*Scotch v. Art Institute of California* (2009) 173 Cal.App.4th 986, 1013 (*Scotch*).)

The interactive process "imposes burdens on both the employer and employee. The employee must initiate the process unless the disability and resulting limitations are obvious. 'Where the disability, resulting limitations, and necessary reasonable accommodations, are not open, obvious, and apparent to the employer, . . . the initial burden rests primarily upon the employee . . . to specifically identify the disability and resulting limitations, and to suggest the reasonable accommodations.' " (*Scotch, supra,* 173 Cal.App.4th at p. 1013.) "An employee cannot demand clairvoyance of his employer. [Citation.] ' "[T]he employee can't expect the employer to read his mind and know he secretly wanted a particular accommodation and sue the employer for not providing it. . . ." ' [Citation.] 'It is an employee's responsibility to understand his or her own physical or mental condition well enough to present the employer at the earliest opportunity with a concise list of restrictions which must be met to accommodate the employee.' [Citation.] [The employee] therefore [is] obliged 'to tender a specific request for a necessary accommodation.' " (*King, supra,* 152 Cal.App.4th at p. 443.)

In support of its motion for summary adjudication of the failure to accommodate and interactive process claims, Telecare presented evidence that management granted all Jones's requests for medical leaves of absence; management never asked Jones to work during her leaves of absence and Jones

understood she should not work during her leaves; Harper covered Jones's caseload during her leave; Jones never provided Telecare with a doctor's note requiring modified job duties; and Jones admitted her medical care provider released her to return to work without restrictions.  Based on this evidence, Telecare successfully argued Jones did not request an accommodation or initiate an interactive process, apart from requesting the medical leaves that Telecare granted.

On appeal, Jones argues she "communicated her concern about being spread too thin in an email and communicated her struggles with meeting deadlines after she returned from medical leave during her performance review."  However, in the cited email, Jones said nothing about any purported limitations stemming from her disability, and she did not request any sort of accommodation due to a unique limitation.  On the contrary, Jones wrote that "[w]e"—i.e., all the social workers—"are just overwhelmed with all the changes, new paperwork, a tougher population of residents, and being expected to work miracles," emphasizing, "I speak for us *all*."  (Italics added.)

As for her performance review, although Jones wrote she had been "working extra time to do my best to improve my performance again through med. issues," there is no evidence that she disclosed any limitation or need for an accommodation to assist her in this task.  More importantly, Jones's doctor released her to return to work without restrictions and Jones never suggested her performance difficulties stemmed from her medical limitations.  Rather, she maintained any shortfall in performance was entirely due to "sudden [and] drastic changes within the facility as well as a large increase in paper work, change of office, [and] increased [discharge] [and] admissions"—

28

in other words, the same issues she had complained of in her email on behalf of *all* the social workers at La Paz. In light of her return to work without restrictions, Jones's vague reference to "med. issues" on her performance review and complaints about workload issues unrelated to her medical condition were insufficient to initiate an interactive process. (See, e.g., *King, supra,* 152 Cal.App.4th at p. 444 [absent evidence that employee "communicated his distress to his supervisors or made the kind of specific request for a modified work schedule required to trigger an employer's duty to provide accommodation," employee's vague complaint about hours he was required to work when he returned from leave was insufficient to raise triable issue of fact, particularly in view of physician's note containing no specific restrictions].)

Finally, Jones argues Telecare did not make a reasonable or good faith accommodation when it granted her request for medical leave because she "was required to work eight hour days during her medical leave" to keep up with her paperwork. The record simply does not support this assertion. The undisputed evidence shows Jones had a backlog of paperwork before her first medical leave, and Harper had agreed to "assist [Jones] with catching up" by completing some of the paperwork. In her declaration, Jones said she "noticed necessary paperwork" was not completed during her leave, and she felt compelled to work on it because she "did not want to get in trouble or counseled for falling behind." However, at her deposition, Jones admitted no one asked her to work while on medical leave and she did not record her work time or otherwise notify Telecare that she was working while on leave. Telecare cannot be faulted for failing to accommodate Jones when Jones, by her own admission, took

it upon herself to work without any notice to or urging from Telecare.  (See, e.g., *Spitzer v. Good Guys, Inc.* (2000) 80 Cal.App.4th 1376, 1384 [if employer did not know a reasonable accommodation was not working, a duty to provide further accommodation never arose]; accord, *Brown v. Los Angeles Unified School Dist.* (2021) 60 Cal.App.5th 1092, 1108 ["[i]f a reasonable accommodation does not work, the employee must notify the employer"].)

## DISPOSITION

The judgment is affirmed.  Defendants Telecare Corporation, Michael Meyer, and Cherie Harper are entitled to costs.


### NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS



EGERTON, J.


We concur:



EDMON, P. J.



LAVIN, J.

30